



# IDAHO COUNCIL OF GOVERNMENTS

*Connecting Business, Community, Government in Southwest Idaho*

125 E. 50TH STREET | GARDEN CITY, ID 83714 | P (208) 322-7033 | (800) 859-0321 | F (208)322.3569

## PROPOSED DEDESIGNATION

### LEGAL AUTHORITY

According to Section 305(b)(5)(C) of the Older Americans Act and 45 CFR Section 1321.35, the Idaho Commission on Aging (ICOA) may not withdraw ICOG's area agency designation until, after reasonable notice and opportunity for a hearing, it finds that:

> (1) An area agency does not meet the requirements of this part;
> (2) An area plan or plan amendment is not approved;
> (3) There is substantial failure in the provisions or administration of an approved area plan to comply with any provision of the Act or of this part or policies and procedures established and published by the State agency on aging; or
> (4) Activities of the area agency are inconsistent with the statutory mission prescribed in the Act or in conflict with the requirement of the Act that it function only as an area agency on aging.

### BACKGROUND

**The Parties**

Kendra Kenyon, PhD joined the Idaho Council of Governments (ICOG) on January 1, 2011. Dr. Kenyon has degrees in psychology, communication, and organizational and leadership development.  Dr. Kenyon has extensive experience in assisting corporations to reach their full potential.

During June of 2011, Sarah Scott, JD, joined ICOG as the Director (AAA III Director) of its Area Agency on Aging Serving Southwest Idaho (AAA III) division.  Ms. Scott came to the AAA with extensive experience in aging issues and programs gained through her service as the Program Operations Manager for the Idaho Commission on Aging (ICOA) during 2001 through 2009 and as an attorney whose specialties included aging and disability-related areas of practice.

Sam Haws (ICOA Administrator) was appointed as the Administrator for the Idaho Commission on Aging in August of 2011.  Ms. Haws, whose background is in banking rather than aging services, previously served as an Idaho State Tax Commissioner.  ICOA's Deputy Administrator, Jeff Weller, was hired within the same timeframe.  Mr. Weller was previously employed in some capacity by the Idaho Department of Health & Welfare.  His experience related to aging issues is unknown.

The parties initially enjoyed what appeared to be a collegial and collaborative working relationship, beginning with their joint effort to address the issues identified in the *Coordination and Delivery of Senior Services in Idaho* report released by the Legislature's Office of Performance Evaluations (OPE) in February 2011 (Report).

## OPE Report

To better understand the needs of Idaho's growing senior population and to identify the potential for additional efficiencies in how senior services were provided, the Idaho Legislature's Joint Legislative Oversight Committee (JLOC) directed OPE to study Idaho's six area agencies on aging.  OPE evaluators initiated the review process in 2010 and released their report in 2011.

On page 25 of the OPE Report, OPE discussed the challenges involved with the contracting process and noted that:

> The contracting process presents challenges for the AAAs and providers. Several AAAs noted they have used the same providers for many years because there is a lack of competition for senior services, particularly in some rural areas. The participation of multiple potential providers helps to reduce costs and improve the quality of services; the lack of competition could have the opposite effect.

In Chapter 4 of the OPE Report, the OPE further described the delivery of services and several different subcontracting models that it believed had led to variations in how reimbursements were distributed to providers. At that time, most nutrition contracts were made directly between the AAAs and the providers. However, some providers subcontracted with additional providers, particularly for Congregate and Home-Delivered Meals.

In OPE's review of three subcontracting models, it found significant variation in how subcontractors coordinated, delivered, and received reimbursements for services.  One of those variations was specific to the Elderly Opportunity Agency (EOA), the AAA's contractor that coordinated nutrition services across much of the rural portion of Planning and Service Area III (PSA III).  EOA's Board of Directors was (and still is) composed of representatives from the Boards of Directors of the same senior centers that served as its nutrition and transportation subcontractors.

Under the service model identified by OPE as "Model Three" (EOA Model), reimbursements from meals served at the centers were pooled and redistributed among all centers to pay for EOA services. The OPE found that for most of those centers, the value of the services provided by EOA exceeded the amounts the centers would have received in direct reimbursements. However, at least three larger centers and two smaller centers would have received more money from the AAA using a direct contract approach.

In OPE's review of subcontracts between EOA and senior centers, it found that the contracts did not clearly state that reimbursement for meals provided through the senior center would be pooled by EOA and that some centers' reimbursements could be used to support other centers.

Although each center entered into a separate contract with EOA, the success of the EOA Model relied on whether the larger centers remained a part of the pool. These centers had the option to seek a direct contractual relationship with the AAA. If the larger centers did contract directly with the AAA, EOA might not derive enough income from meals served at the remaining centers to continue its contracting approach. For example, if the collective costs of the smaller senior centers exceeded the AAA's total reimbursement to EOA, EOA would have to seek additional revenue sources.

In response to its concerns regarding the EOA Model, the OPE made the following recommendation:

> **Recommendation 4.4**: To ensure all centers have a clear understanding of the Elderly Opportunity Agency's use of reimbursements, the AAA in Area III should require EOA to add clarifying language to its contracts with centers that explains how reimbursements are pooled among all participants.

To address this recommendation, the AAA inserted the following "Special Condition 3" into its SFY 2012 (July 1, 2011-June 30, 2012) nutrition and transportation contract with EOA:

> Pursuant to Recommendation 4.4 of the Office of Performance Evaluations-Coordination and Delivery of Senior Services in Idaho Report dated February 2011:
>
> a. EOA shall add clarifying language to each Memorandum of Understanding (MOU) with providers/centers that explains how reimbursement is pooled among all of the providers.
> b. Such language shall be provided to Area Agency for approval prior to its addition to the MOU.
> c. Any MOU entered into with a provider/center shall not be considered valid unless it contains the clarifying language referred to in subparagraph a. above.

Beginning on October 28, 2011, the AAA III Director began sending written requests to EOA's Executive Director requesting an update on the status of the implementation of the Special Condition. However, EOA's Executive Director was not cooperative or forthcoming in complying with this material term of the contract. AAA III finally obtained compliance in March 2012. A process which should have taken several weeks, at most, took almost nine months, required AAA III to issue a Notice of Breach and Intent to Terminate Contract, and caused significant consternation among the impacted seniors.

During this process, AAA III determined that the pooling method used by EOA resulted in a significant disparity in reimbursements among the senior center subcontractors ranging from a low of approximately $0.87 per Congregate meal/$1.00 per Home-Delivered Meal to a high of approximately $4.13 per Congregate meal/$3.87 per Home-Delivered Meal. Even senior centers that appeared to be similarly situated were treated in a disparate manner.

ICOA appeared to be supportive and appreciative of AAA III's efforts to address Recommendation 4.4. Resolution of the issue allowed ICOA to report to OPE that the issue had been addressed and closed. See OPE Second Follow-Up Report published in March 2013.

**Procurement Process**

Soon after resolution of the EOA subcontracting issue, AAA III initiated a procurement process for all of its contracted services. Two agencies, EOA and CCOA-Aging, Weatherization, and Human Services (CCOA), submitted proposals to provide nutrition services in the rural communities in PSA III. When the contract was awarded to CCOA, EOA initiated an appeal process.

For many years, ICOA served as the ultimate appellate body for an unhappy contractor or client; the ICOA Administrator had never revised this policy. Thus, ICOG's procurement requirements provided for a final appeal to ICOA. EOA first appealed to ICOG's President and then to the ICOG Board. After its appeals were rejected, EOA then made two separate attempts to file an appeal with ICOA.

Although two ICOA staff members, the Deputy Administrator and ICOA's Contracts Manager, Vicki Yanzuk, had reviewed ICOG's procurement process and found no defect, ICOA maintained that it was not obligated to hear EOA's appeal by EOA. See Letters from the ICOA Administrator attached as Exhibits _____.

**EOA Lawsuit**

As a result of ICOA's refusal to hear EOA's appeal, EOA immediately filed a lawsuit against ICOG and CCOA. ICOG then filed a counterclaim for damages incurred as a result of three breaches of contract by EOA under its previous nutrition contract. Two of the breaches were substantial and had caused ICOG to expend significant time and effort in attempting to bring EOA into compliance with the terms of its contract. In fact, ICOG requested damages of approximately $50,000.

ICOG's legal fees related to the defense of EOA's claims were properly covered by its liability insurance provider. However, liability insurance does not cover legal fees associated with the pursuit of a claim. The AAA III Director believed such fees should be treated as an AAA administrative cost and contacted ICOA to confirm same. Weller responded affirmatively on _____, 2012. See Exhibit _____.

Because costs of administration may be taken from Titles IIIB (Supportive Services), C-1 (Congregate Meals), and C-2 (Home-Delivered Meals), The AAA III Director believed it was appropriate to assess the costs of the counterclaim against the funds allocable to the centers involved in the litigation, rather than against unrelated Title IIIB Supportive services.[1]

---

[1] The AAA III Director mistakenly believed that the AAA's administration budget was comprised solely of Title IIIB funds and that allocating the costs of litigation against Title IIIC-1 and C-2 nutrition funds would require a transfer of such funds to Title IIIB. After reviewing Sections 308(a)(4), (5) and (6) of the OAA, the AAA III Director acknowledges that the ICOA Administrator was correct in her assertion that any such transfer of funds between

The AAA III Director prepared a letter to CCOA regarding the nutrition funding reduction and forwarded it to ICOA's Deputy Administrator and ICOA's Financial Specialist Brian Warner on January 29, 2013.  See Exhibit _____ attached hereto.  The AAA III Director received no objection from ICOA.  CCOA then distributed copies to its nutrition subcontractors.

Several months later, the ICOA Administrator attended a "Capital for a Day" event held in Emmett on March 27, 2013.  This event took place almost two months after the AAA III Director had notified ICOA of its intent to reduce the allocation for those centers involved in the EOA lawsuit.  Apparently, the Governor had not been made aware of the EOA litigation and was surprised or embarrassed when representatives from one or more senior centers protested the nutrition funds reduction.

One month after the Emmett meeting, the ICOA Administrator sent a letter to the AAA III Director objecting to the AAA's apportionment of attorneys' fees against the nutrition funding for the senior centers involved in the EOA lawsuit.  See Exhibit _____ attached hereto.  In this letter, the ICOA Administrator claimed she had just learned of the letter to CCOA.  However, as noted above, the AAA III Director had notified ICOA three months earlier.  If ICOA had voiced any objections, the AAA III Director would have had the opportunity to change her course of action and avoid the resulting upset.

The ICOA Administrator' letter also stated that the legal fees should have been paid by ICOG's insurance provider.  The AAA III Director responded that only those fees related to defense of EOA's lawsuit were properly payable by ICOG's insurance provider. See e-mail attached as Exhibit _____.  As the AAA III Director received no response, she assumed that the ICOA Administrator understood the difference and agreed that the fees not attributable to ICOG's legal defense were properly payable as costs of administration (See OAA Section 502(c)(4)(A)(viii)).  In fact, ICOG's SFY 2014 AAA administration budget, which was reviewed and approved by ICOA, included attorneys' fees of approximately $24,000 for non-defense related litigation costs.

ICOA was eventually joined in the lawsuit as a necessary party.  After almost a year of litigation and the expenditure of tens of thousands of dollars, the parties stipulated to a dismissal of the lawsuit.  It is unknown how much of the time and money expended could have been saved had ICOA heard EOA's appeal.

**ICOA Program Changes**

Beginning in January 2013, ICOA began the process of evaluating the AAAs' delivery of services
On March 26, 2013, the ICOA Administrator e-mailed to the AAA Directors ICOA's "Comprehensive Review of Coordination and Delivery of Senior Services."  Copies of the review documents are attached as Exhibits _____ .  In almost all categories, AAA III was the

---

Titles IIIB and C, would require ICOA's prior approval. However, the point is probably moot because an AAA's administration budget can be comprised of funds allocated from Titles C-1, C-2, and E, not just Title IIIB.

---

AREA AGENCY ON AGING                                                    ECONOMIC DEVELOPMENT DISTRICT
SERVING SOUTHWEST IDAHO                                                                              REGION III

highest performer, including with respect to the portion of its budget retained for in-house services as compared to the portion contracted out.

During the same time period, the ICOA also began developing program implementation guides for the following services provided directly by the six AAAs:  Information and Assistance, Case Management, Ombudsman, and Adult Protection.  Two of AAA III's staff, Roberta Bischel and David Cline, participated in the development process.  According to Roberta Bischel, the role of the AAA staff was to draft implementation guides that reflected the program changes ICOA had formulated.  AAA staff were not asked for input on the program changes themselves as ICOA had already made those decisions.  Several of the program changes were very concerning to AAA Directors and staff.

First, the changes that resulted in most clients being approved for in-home services (i.e. Home-Delivered Meals, Homemaker, and Respite) by means of a telephone interview rather than an in-home assessment were of grave concern.  Never performing an in-home visit means that unscrupulous individuals are provided with an opportunity to take advantage of the system or that other frail individuals may not receive all the services they need, leaving them at risk.  For example, AAA III recently received an Adult Protection complaint involving an individual who had previously been able to remain safely in her home with occasional visits by an AAA Case Manager.  After the program change, the client's home situation deteriorated so significantly that intervention by Adult Protection became necessary.

The second most concerning change was that Adult Protection complaint intakes be performed by Information and Assistance staff instead of Adult Protection staff.  Information and Assistance staff, who do not work in the field and do not perform Adult Protection investigations, are tasked to gather only the most basic information necessary to complete the intake/assessment instrument.  As a result, the Adult Protection Investigator to whom the case is assigned often has to contact the reporter again to obtain additional information.  This change has resulted in frequent complaints by callers (especially "mandatory reporters") who do not appreciate having to repeat information to an Adult Protection Investigator.

The last change, and possibly the most concerning, is that the ICOA has forced the AAAs to use federal OAA funding to perform Information & Assistance screening and intake of Adult Protection clients, including those who are under the age of 60 years.  With the exception of Title IIIE Caregiver services and Title V employment services, OAA funding may not be used to provide services to individuals under the age of 60 years.  This new requirement is a blatant violation of the OAA requirements and puts Idaho's OAA funding and the AAAs at high risk.

The AAA Directors responded regarding many of these changes; according to the ICOA Administrator, ICOA received more than 100 comments.  However, the ICOA Administrator failed to indicate how many of these comments actually resulted in any change.

Apparently unbeknownst to the AAAs, the ICOA had also been working on significant changes to the AAA budget guidelines.  During the quarterly ICOA Commissioners' meeting held on May 2, 2013, ICOA presented these new "funding standards."  However, the ICOA failed to release the new SFY budget templates to the AAAs until May 24, 2013.  Because ICOA and the AAAs

operate on the State Fiscal Year (July 1 through June 30), this meant that the AAAs had little more than one month to:  (1) develop an understanding of the new budget requirements; (2) determine how to implement the requirements; (3) develop budgets for themselves and their providers; (4) actually implement the resulting changes (which required most AAAs to quickly lay off staff); and (5) prepare and execute provider contracts.

Most of the other AAA Directors and several of the AAA's umbrella agency directors voiced their concerns and dissatisfaction with ICOA's changes and the manner in which they were developed and implemented.  See Exhibits _____.  In fact, several of the other AAA Directors supported the AAA III Director's efforts to seek intervention by Representatives Bolz and Youngblood.

AAA III <u>immediately</u> began the process of implementing ICOA's program and budget changes. However, much of the resulting chaos could have been avoided (and lay-offs could have been implemented such that staff had more time to look for alternative employment), if the AAAs had been provided with adequate notice of the impending changes.

ICOG's President, Director of Finance Heather McCarney, AAA III Director, and AAA Contracts Manager began work on the budget using ICOA's new budget template.  However, because of the system ICOG had used for many years and with which it had submitted budgets, including for the immediately preceding year, it was difficult for the Director of Finance to develop a budget using the new template and required her to work closely with ICOA's Finance Specialist.

In the midst of this process, the Director of Finance Heather McCarney accepted a position with another agency; her last day with ICOG was July 1, 2013.  Because the AAA III's Director's father passed away suddenly on June 26, 2013, the last budget revision was submitted in her absence.  The budget was finally approved on June 27, 2013.

ICOG then hired a new Director of Finance, Valerie Grindle, CPA, on July 8, 2013.  ICOG's President, AAA III Director, and AAA Contracts Manager reviewed the budget with the new Director of Finance and requested that she assist them to ensure that the budget was appropriate and met ICOA's requirements.  This review resulted in AAA III implementing a budget revision process to correct various items.

On August 23, 2013, the ICOA Administrator and the ICOA Deputy Administrator met with various AAA III staff and representatives to "answer questions."  Most of the meeting was devoted to the ICOA Administrator's discussion of the program changes interspersed with negative comments regarding the other AAAs.  Finally, an AAA staff member expressed her discomfort with the discussion and asked that it be confined to issues relevant to AAA III.

ICOG's Board Chair Gordon Cruickshank and President Kendra Kenyon were given the opportunity to ask several questions regarding ICOA's vision of Idaho's aging network, ICOA's strategy to take advantage of the knowledge and expertise of the AAA Directors and staff, ICOA's logic and reasoning supporting the changes implemented, and the basis for ICOA's apparent opinion that the AAA's direct services are less important/effective than their contracted services.  The ICOA Administrator stated something to the effect that "when they got rid of all

the old teachers, Idaho's education system improved." It became obvious at that point that the ICOA's relationship with the AAAs had changed course.

Soon after the meeting, AAA III submitted a budget revision. The ICOA Administrator rejected the budget amendment and stated that not more than 10% of the ICOG President's salary could be paid from AAA funds. However, the ICOA Administrator provided no basis for this reduction. It is the AAA III Director's understanding that the only restriction on costs of administration is the restriction set forth in Section 304(d)(1)(A) of the OAA stating that an AAA's costs of administration cannot exceed 10% of the federal allocation.

The ICOA required various additional corrections, which the AAA performed. The AAA was finally alerted on September 30, 2013 that the budget was approved. The budget revision process was extremely frustrating for Ms. Grindle such that when she was offered the opportunity to travel abroad, she resigned from ICOG, putting ICOG in the position of searching again for a Director of Finance.

**Intrastate Funding Formula**

According to ICOA's comprehensive study of the AAAs, AAA III was the highest performing AAA in almost all categories. In reviewing the study, ICOG's President and AAA Director questioned how several of the other AAAs could fund the high service hours associated with some of their programs. This led to a review of ICOA's Intrastate Funding Formula (IFF).

ICOG's President and AAA Director determined that the IFF fails to comply with the requirements of Section 305(a)(2)(C) of the Older Americans Act (OAA). See Exhibit _____ attached hereto. ICOG's President promptly informed ICOA of ICOG's concern and made several requests asking that the IFF issue be addressed.

As a result of ICOA's failure to include a large category of individuals aged 60 and older in the IFF, the funding received by ICOG on behalf of seniors in PSA III is diluted, resulting in fewer funds being available to serve the "targeted" population of individuals in the greatest economic and social need. This failure harms the very population on which the ICOA and the AAAs are required to focus.

Interestingly, of the 42 states required to use an IFF, only Idaho fails to take into account the geographical distribution of individuals aged 60+ as is required by the OAA.

Although the Administration on Aging (AoA) declared the IFF to be compliant, ICOG believes it was misled by ICOA's inclusion of individuals aged 60+ in its IFF chart. This belief is supported by ACL's initial response referring to the column of 60+ population as evidence that such individuals are taken into account as required by the OAA. See Exhibit _____ attached hereto. It should be noted that Terry Duffin, the AoA employee who was initially responsible for reviewing the formula and recommending its approval to the Assistant Secretary for Aging, remains responsible for oversight of Idaho, including the issues related to the IFF.

The role of the Commissioners is to oversee the duties, powers and authorities of the commission.  See IC § 67-5002.  This oversight duty includes ensuring that Idaho's IFF is fair, equitable, and complies with the OAA.  Unfortunately, the ICOA Commissioners' letters to JFAC serve only to demonstrate their failure to fully comprehend the issue.  For example:

- Commissioner Watson's letter incorrectly states that _____
- _____

ICOG's attempts to achieve correction of the IFF (and thereby obtain more funding for PSA III) directly align with its mission to serve seniors in the ten counties of southwest Idaho and its obligation to advocate on their behalf. ICOG and the AAA III Director's attempts to seek resolution of the IFF are the main reason for ICOA's attempt to revoke ICOG's designation as the AAA for PSA III.

**February ICOA Quarterly Commissioners' Meeting**

The ICOA Commissioners meet quarterly and the AAA III Directors, or their designees, are required to attend.  The AAA III Director and ICOG's Board Vice Chair, Judy Peavey-Derr, attended the quarterly Commissioners' meeting held on February 6, 2014.

One of the first items on the agenda was the ICOA Administrator's report.  Much of the report was focused on the ICOG Board's letter delivered to the Governor in November 2013.  A recording of the meeting is attached hereto as Exhibit _____.  The AAA III Director was not allowed to speak to the issue or to otherwise defend herself.  The outcome was a unanimous vote that the Commissioners send a letter to the ICOG Board demanding that the AAA III Director be dismissed or sanctioned because of her advocacy activities on behalf of PSA III.

The ICOA Commissioners first directed the ICOA Administrator to prepare the letter.  After the ICOA Administrator declined, the ICOA Commissioners attempted to go into an illegal executive session.  However, ICOG's Vice Chair reminded them they could not do so as an executive session was not included in the agenda.  This was confirmed by ICOA's Deputy AG and a special meeting was scheduled for the following Monday.  During the meeting, the Commissioners discussed a letter, a copy of which was not provided to ICOG or to the AAA III Director.  The "letter" finally arrived at ICOG on _____ but said nothing about sanctioning or dismissing the AAA III Director.

Another item discussed during the meeting was AAA III's Adult Protection (AP) website.  According to ICOA, it had become aware of this issue on January 13, 2014, more than two weeks before the quarterly Commissioners' meeting.  Instead of immediately notifying the AAA III of her concerns, the ICOA Administrator waited until the Commissioners meeting.  During her presentation, the ICOA Administrator treated the AP issue as critical in nature.  However, if the issue was so critical, it is odd that no one from ICOA had bothered to contact AAA III prior to the meeting so that it could be rectified immediately.

In addition, the AAA III Director sent a follow-up e-mail to the ICOA Administrator on _____ asking for further clarification of the AP issue so that all necessary corrections could be made.  However, the ICOA Administrator never responded and the AAA III Director let the issue move to the back burner.  The AAA III Director was not intentionally "disobeying" an ICOA demand but was merely awaiting further clarification before taking any action.

Following the meeting, the ICOG Board instructed ICOG legal counsel, David Leroy, to obtain a copy of the audio recording of the meeting so that they could be informed regarding the basis for demanding that the AAA III Director be sanctioned or dismissed.  Weller attempted to dissuade Mr. Leroy from obtaining the requested document.  See Exhibit _____ attached.  Because of the critical nature of the Commissioners' vote, the ICOG Board believed it was necessary to have all pertinent information available for consideration.

The ICOA Commissioner appointed to represent PSA III made various comments following the ICOA Administrator's report and in conjunction with the ICOA Commissioners' discussion regarding sanction or dismissal of the AAA III Director (ostensibly for her efforts to inform the members of the AAA Advisory Council and other concerned/impacted citizens of the region about the ramifications of ICOA's current funding formula).

> **Lorraine Elfering at approximately the 52 minute mark:**
>
> Madam Chair I'd like to make a comment and it's just in the sense it not only affected people at the state level **the information was being distributed to the senior centers and the people on her advisory council** and so now there's a lot of people being drawn into the issues and sometimes when you're looking at things from one perspective you're not seeing the other perspective and it does create a lot of questions and a lot of concerns so now there's a lot of people involved and **they're no longer functioning in the faithful level that they need to be because they now doubt what's happening at the state level as well as the AAA level and so that's causing a lot of problems**.
>
> **Lorraine Elfering around the 57 minute mark:**
>
> "As a comment and maybe an amendment is.. is somehow this has to be resolved amicably.  I don't know what that process is but it has to stop so that ICOA and your agency as well can get back to the focus and what the main job is every day or the main goal.  This other stuff has to go away in my opinion.  I don't know if we verbalize that or write that down in this letter or what the proper way is but I do believe it has to stop."

At the end of the recording, after the meeting had been adjourned and right before someone states that the recorder is still on and turns it off, the ICOA Administrator can be heard making the following comment:

> "...she wants to take money from the rural areas and bring to Boise...Boise, Nampa have...they have all kinds of resources...small communities like Parma..."

Not only is the ICOA Administrator's comment completely incorrect and without any basis whatsoever, inflammatory comments such as these are exceedingly unprofessional and divisive. They also demonstrate the standard of conduct currently endorsed and adopted by ICOA management.

As the Area Agency on Aging designated for PSA III, ICOG and the AAA III Director have the duty and obligation to act in the best interests of their constituents.  ICOG has supported and directed the AAA III Director in her efforts to seek resolution of the IFF.

### AAA III 2014 On-Site Review

Cindy Cobb was hired as ICOG's new Director of Finance effective September 30, 2013.  Ms. Cobb has worked very diligently to learn ICOG's various programs, including the AAA.  Because Ms. Cobb has extensive experience working with federal grants in the non-profit arena, she quickly identified ICOG's current finance system, GMS, as difficult and cumbersome to use and suggested a move to a much simpler system such as Quickbooks.  ICOG's Board approved this change and authorized ICOG to retain a CPA firm to assist in the transition from GMS to Quickbooks.  Whittaker and Associates was retained for this purpose and the transition process was initiated.  The plan was to run the two systems side by side through the end of FFY 2014 to ensure a smooth transition and to then use Quickbooks exclusively beginning in FFY 2015.

ICOA initiated an on-site review of the AAAs beginning in February, 2014.  AAA III's review was scheduled to begin on May 2, 2014 with submission of various program and fiscal documents. The on-site review portion was to begin on May 19, 2014.  AAA III submitted its documents in a timely manner.  However, ICOA responded that the fiscal documents provided were not satisfactory.  See Exhibit _____ attached hereto.

The AAA's Director of Finance, Assistant Director of Finance, and Contracts Manager immediately began working to go back into the GMS system to generate the type of reports ICOA had requested.  As a result of the current staff members' inexperience with GMS, this has been an extremely difficult and frustrating process.  The Director of Finance even enlisted the help of GMS staff who provided as much guidance as possible.  ICOA then notified the AAA that it was postponing the on-site portion of the review because it had not received the financial detail requested.

ICOG fiscal staff were still working to assemble the required reports on May 30, 2014 when the ICOA issued a letter informing ICOG that ICOA would not renew the Performance Based Agreement and that it was initiating proceedings to revoke ICOG's designation as the AAA for PSA III.

**Conclusion:**  ICOA states they were very optimistic about issues being resolved and wanted to move forward.  However, the ICOA instead initiated a campaign of harassment against ICOG and the AAA III Director, apparently intended to lead to AAA III's dedesignation.  For example,

- The ICOA Administrator undertook efforts to discredit the AAA III Director and divert attention from the IFF by telling others that the AAA III Director was trying to take funds from rural areas of PSA III and bring them to Nampa and Boise.
- The ICOA Administrator provided misinformation regarding the IFF to the Lt. Governor and to Governor Otter's assistant, Tammy Perkins, and likely to others.
- The ICOA Administrator began requesting information from ICOG that was outside the purview of the ICOA.
- The ICOA took an inordinate amount of time, approximately 40 days, to review and approve a budget amendment that was primarily for the purpose of increasing Congregate Meals and Transportation reimbursements.  Resulting in delayed payments to AAA providers, many of which were senior centers.
- The ICOA delayed and trivialized the Area Plan review and approval process, obviously with the end goal of placing AAA III in the position of not having an approved Area Plan.

The ICOG and the Area III Director do not refuse to accept ICOA's authority and guidance, are not intentionally non-compliant in providing the ICOA with documentation related to Older Americans Act and Idaho Senior Services Act funding; do not continue to undermine ICOA's direction through persistent challenges of ICOA's policies and guidelines; and do not exhibit unprofessional conduct.  Instead, the ICOG and AAA III Director have and continue to advocate to assure that best interests of the citizens living in PSA III are recognized and addressed.

This attempted dedesignation is nothing more than retaliation for ICOG/AAA III's advocacy on behalf of its constituents and a blatant attempt to silence the IFF issue.

## GROUNDS FOR WITHDRAWAL OF AAA DESIGNATION

I.      **Mission:  Activities of the Area III AAA are inconsistent with the statutory mission prescribed in the Act and are in conflict with the requirement of the Act that it function only as an area agency on aging.  (45 CFR 1321.35(4)**

The objectives (i.e. mission) of the OAA are set forth in Section 101 as follows:

The Congress hereby finds and declares that, in keeping with the traditional American concept of the inherent dignity of the individual in our democratic society, the older people of our Nation are entitled to, and it is the joint and several duty and responsibility of the governments of the United States, of the several States and their political subdivisions, and of Indian tribes to assist our older people to secure equal opportunity to the full and free enjoyment of the following objectives

(1) An adequate income in retirement in accordance with the American standard of living.

(2) The best possible physical and mental health which science can make available and without regard to economic status.

(3) Obtaining and maintaining suitable housing, independently selected, designed and located with reference to special needs and available at costs which older citizens can afford.

(4) Full restorative services for those who require institutional care, <u>and a comprehensive array of community-based, long-term care services adequate to appropriately sustain older people in their communities and in their homes, including support to family members and other persons providing voluntary care to older individuals needing long-term care services.</u>

(5) Opportunity for employment with no discriminatory personnel practices because of age.

(6) Retirement in health, honor, dignity—after years of contribution to the economy.

(7) Participating in and contributing to meaningful activity within the widest range of civic, cultural, educational and training and recreational opportunities.

(8) Efficient community services, including access to low cost transportation, which provide a choice in supported living arrangements and social assistance in a coordinated manner and which are readily available when needed, with emphasis on maintaining a continuum of care for vulnerable older individuals.

(9) Immediate benefit from proven research knowledge which can sustain and improve health and happiness.

(10) Freedom, independence, and the free exercise of individual initiative in planning and managing their own lives, full participation in the planning and operation of community based services and programs provided for their benefit, and protection against abuse, neglect, and exploitation. (emphasis added)

The mission of an area agency is set forth in 45 Code of Federal Regulations Section 1321.53(a):

(a) The Older Americans Act intends that the area agency on aging shall be the leader relative to all aging issues on behalf of all older persons in the planning and service area. This means that the area agency shall proactively carry out, under the leadership and direction of the State agency, a wide range of functions related to advocacy, planning, coordination, inter-agency linkages, information sharing, brokering, monitoring and evaluation, designed to lead to the development or enhancement of comprehensive and coordinated community based systems in, or serving, each community in the planning and service area. These systems shall be designed to assist older persons in leading independent, meaningful and dignified lives in their own homes and communities as long as possible.

Most importantly, an area agency is mandated to serve as the public advocate for seniors and aging services within its planning and service area:

Sec. 1321.61 Advocacy responsibilities of the area agency.

(a) The area agency shall serve as the public advocate for the development or enhancement of comprehensive and coordinated community- based systems of services in each community throughout the planning and service area.
(b) In carrying out this responsibility, the area agency shall:
(1) Monitor, evaluate, and, where appropriate, comment on all policies, programs, hearings, levies, and community actions which affect older persons;
(2) Solicit comments from the public on the needs of older persons;
(3) Represent the interests of older persons to local level and executive branch officials, public and private agencies or organizations;
(4) Consult with and support the State's long-term care ombudsman program; and
(5) Undertake on a regular basis activities designed to facilitate the coordination of plans and activities with all other public and private organizations, including units of general purpose local government, with responsibilities affecting older persons in the planning and service area to promote new or expanded benefits and opportunities for older persons; and
(c) Each area agency on aging shall undertake a leadership role in assisting communities throughout the planning and service area to target resources from all appropriate sources to meet the needs of older persons with greatest economic or social need, with particular attention to low income minority individuals. Such activities may include location of services and specialization in the types of services must needed by these groups to meet this requirement. However, the area agency may not permit a grantee or contractor under this part to employ a means test for services funded under this part.

The activities of ICOG and the AAA III Director seeking review and correction of the IFF defects are in direct and complete alignment with their duty to act as advocates for PSA III. When the actions of the state unit on aging (i.e. ICOA) are detrimental to the citizens of PSA III, ICOG and the AAA III Director have the duty to advocate for their resolution.

As a result of ICOA's refusal to satisfactorily address the non-compliant IFF, together with the program changes negatively impacting services for seniors and vulnerable adults, the ICOG Board of Directors delivered the attached letter to Governor Otter. The letter expresses the Board's concerns with the ICOA Administrator and Deputy Administrator and questions their ability to lead Idaho's aging network. See Exhibit _____ attached hereto.

**Public Records Request**

Since 2012, the ICOA has been aware that AAA III intendsto move toward direct contracting for nutrition and transportation services. Part of such process was an evaluation of options available to distribute funding among the providers. Historically, the AAA III had funded providers based on the number of units served during the prior year. However, because several large senior centers had discontinued participation in AAA-funded nutrition programs, they would have no "prior year's units served" on which the AAA III could base a budget. The AAA III wanted to develop a method of funding that was equitable and that would assure all communities within PSA III had access to funding.

On _____, 2012, the Area III Director requested from ICOA the formula used to allocate funds among the AAAs.  The purpose of obtaining such information was to assist Area III in developing a formula for distributing funding to nutrition providers who chose to contract directly with the AAA beginning in SFY 2015.  Brian Warner, ICOA's Finance Specialist, replied that he would forward the requested information.  See e-mail dated _____.

As the date of direct contracting drew closer, the AAA III Director requested guidance from ICOA regarding issues related to contracting with the providers that had withdrawn from the system and therefore had no recent history of units served.  See Exhibit _____ attached hereto.   The ICOA responded that it was up to the AAA to develop a fair and equitable system.  However, it still had not provided the requested funding formula information.

As a result of ICOA's failure to provide the requested information and their response that it was up to the AAA to develop a fair and equitable system, the Area III Director finally submitted a Public Records Request for such information.  A copy of the Public Records Request is attached as Exhibit _____ and a copy of ICOA's response is attached as Exhibit _____.  As so little information was actually provided by ICOA, it is questionable as to how the ICOA Administrator can claim that staff spent any significant amount of time in producing it.

**AAA III Director's Behavior**

The ICOA Administrator alleges that the AAA III Director's "behavior became so disruptive, the administrator alerted the Lt. Governor's office that ICOA would postpone responding to the Area III director (except for the public records request regarding the IFF) in order to have time to prepare the ICOA budget and presentation to the Joint Finance-Appropriations Committee (JFAC)."

However, other than filing the Public Records Request on January 8, 2014, the AAA III Director had almost no contact with the ICOA Administrator.  The AAA III Director had no verbal communications with the ICOA Administrator since November, 2013, and only very limited e-mail contact during the period in question.  See the e-mails attached as Exhibits ---.

During January 2014, the AAA III Director sent the following e-mails to the ICOA Administrator:

- One e-mail dated January 14, 2014 acknowledging the ICOA Administrator's notification that additional time was required to respond to the Public Records Request.
- One e-mail dated January 16, 2014 requesting a budget amendment.
- One e-mail dated January 21, 2014 wishing the ICOA Administrator a speedy recovery from a medical procedure.
- One e-mail dated January 22, 2014 providing AP investigators' input regarding the new electronic IAPS system.
- One e-mail dated January 22, 2014 requesting guidance related to the OAA dietician requirement.
- Five e-mails dated January 28, 2014 in response to a query from the ICOA Administrator regarding an Adult Protection investigation.  Four of such e-mails contained photos taken at the scene and were too large to send except by separate e-mails.

- One e-mail dated January 30, 3014 requesting a status update on approval of the budget amendment submitted on January 16, 2014.

The AAA III Director, ICOG Board Chair, Rep. Youngblood, and Rep. Bolz met with the Lt. Governor and Tammy Perkins on January 20, 2014. The AAA III Director was given the opportunity to provide information regarding her concerns surrounding the IFF. During the meeting, either Tammy Perkins or the Lt. Governor stated that the ICOA Administrator had told them the following:

- The IFF can only be changed every four years when the new State Plan is submitted to the AoA.
- The IFF can only be changed with the unanimous approval of the ICOA Board of Commissioners.

Both of these statements were incorrect. Section 307(a) of the OAA provides, in part, that "each State shall submit to the Assistant Secretary a State plan for a two-, three-, or four year period determined by the State agency, with such annual revisions as are necessary." Thus, ICOA's IFF can be updated each year through an annual revision of its State Plan. Further, Idaho Code Section 67-5002 (2) specifically states that "[a] majority of the commissioners shall constitute a quorum for the transaction of business, or for the exercise of any power." Thus, there is no requirement for unanimous approval by the ICOA Commissioners to change the IFF.

At the end of the meeting, Ms. Perkins stated that she was very busy with the legislative session and would follow up with ICOG's concerns when the session was over. During the meeting, the AAA III Director noted that neither of the ICOA Administrator's statements had any basis in law and followed up with an e-mail to Ms. Perkins regarding the ICOA Administrator's statements above. See Exhibit _____.

The ICOA Administrator now claims that the funding formula cannot be changed except with the unanimous agreement of the AAA Directors. However, she has provided no such written policy or procedure as a basis for her claim. The AAA Directors have never been provided with the authority to determine, by unanimous action or otherwise, what the funding formula should be. In fact, during a meeting held at ICOA's office in October 2013, the ICOA Administrator told the ICOG President and AAA III Director that the AAAs, umbrella agencies, and Advisory Councils have no say in aging policy. Thus, it is surprising that the ICOA Administrator is now claiming that the AAAs can unanimously decide what Idaho's funding formula will be.

### ICOA Retaliation

Subsequent to ICOG delivering the letter to the Governor and initiating advocacy for correction of the IFF, ICOA began to engage in retaliatory conduct apparently intended to harass and/or "punish" the ICOG/AAA III and to silence the IFF issue. For example, the ICOA consistently rejected AAA III's Area Plan, using mostly trivial and inconsistent reasoning as a basis therefor (see Section III, Grounds for Desdesignation below).

As another example, the ICOA took almost 40 days to review and approve a budget amendment request submitted by AAA III on January 16, 2014.  The AAA III Director made two inquiries regarding the status of the budget amendment, the first on January 30, 2014 and the second on February 7, 2014.  ICOA responded on February 14, 2014 by requesting additional information. The budget amendment was finally approved on February 26, 2014.  Amendment of the budget was critical to provide additional funding to AAA III providers; taking 40 days to review and approve the request was inexcusable.

As another example, many of the Congregate Meal sites in PSA III (particularly the rural areas) do not provide (and have never provided) meals five days per week as required by the OAA. The OAA requires that meal sites serve five days per week unless a lesser frequency is approved by the state unit on aging (i.e. ICOA).  In preparation for direct contracting, the AAA III Director asked ICOA whether it had copies of such approvals on file.

When the AAA III Director learned that ICOA had no approvals on file for PSA III providers, she requested written guidance from ICOA as to how to proceed.  The only guidance provided was that "[w]aivers are only available on a case by case basis and must be presented to ICOA Administrator with justification."  See Exhibit _____ attached hereto.  The AAA III Director then created and distributed a waiver form for each PSA III Congregate Meals provider serving less than five days per week.   The AAA III Director then submitted the waivers to the ICOA Administrator on February 18, 2014.  See Exhibit _____ attached hereto.

Although the AAA III Director had already asked for and received specific guidance on the waiver process, she then received on February 26, 2014 an e-mail from ICOA's Administrative Support Manager, Kevin Bitner, stating that the AAA III Director had not complied with ICOA's required process.  Now, ICOA apparently had a process different from that communicated to the AAA III Director in October 2013:  "[c]onsistent with the other AAAs, waiver requests need to come from the AAA **not** from the service providers. As the responsible agency to implement services in the Planning and Service Area III, the AAA needs to determine if a waiver is needed and submit the basis for the recommendation to ICOA. Please revise the requests, have an authorized person from the AAA sign them, and send to ICOA."

If the AAA III Director had not determined that a waiver was needed (which is rather obvious considering the long history of service provision by the relevant providers), she would not have expended time and effort in developing and distributing the waiver and forwarding it to ICOA. Then, rather than allowing the AAA III Director to submit all waivers under one cover letter, the Administrative Support Manager required that each waiver come under separate letter.  This meant the AAA III Director had to expend a considerable amount of time and effort preparing 15 separate cover letters, with no obvious corresponding benefit to ICOA.  To date, the AAA III Director has received no response from ICOA.

**Conclusion:**  As the designated AAA for PSA III, ICOG has the duty and obligation to advocate on behalf of older individuals in the region and such activity directly aligns with the objectives set forth in the OAA. This duty and obligation, which was not addressed in the AAA Directors' May 13, 2014 letter, may or may not be shared by the other AAA Directors and likely depends on whether they would gain or lose funding as a result of correction of the IFF.  Regardless, it is

highly unlikely that any other AAA Director would come forward given what has and is happening to ICOG.

ICOG and the AAA III Director's pursuit of correction of the IFF is not a "failure on the part of ICOG/Area III to continue services as the AAA in compliance with provisions of 45 C.F.R. part 1321, and policies and procedures established and published by ICOA" and certainly does not "necessitate the withdrawal of Area III's AAA designation." In fact, the time, energy, and resources wasted by ICOA engaging in retaliatory conduct and activities detrimental to the citizens of PSA III provide a good example of why the ICOG Board was compelled to deliver a letter of no confidence to Idaho's Governor.

II.   **Inappropriate Use of Funds and Declining Services:  There is substantial failure in the provisions and administration of Area III's approved area plan to comply with the Act, Title III regulations or the policies and procedures established and published by ICOA (CFR 45 1321.35(1)(3)):  Area III misallocated funds to administration costs, (42 USC 3024(d), thereby reducing available funds for services**

**Inappropriate Use of Funds**

As noted in the OPE Report, ICOA is responsible for maintaining effective and responsive oversight of programs funded by the Older Americans Act and the Idaho Senior Services Act. ICOA claims that AAA III funds were misallocated to pay for ICOG's costs of administration: "By allocating ICOG expenditures directly to the programs, they concealed the true nature of the expenditures to avoid exceeding the 10% administration limit." However, the budget template used by ICOG and submitted to ICOA each year until SFY 2014 (when ICOA introduced a new budget template) clearly reflected ICOG staff costs allocated against each AAA III program. Certainly, nothing was concealed as is alleged by ICOA. See Exhibits _____ attached hereto.

These budgets were reviewed and approved by ICOA prior to any expenditures thereunder. In addition, ICOA thoroughly reviewed ICOG's budgeting methodology during its on-site review conducted from March 26 through March 28, 2012. In its report, the only comment regarding ICOG/AAA's financial review is found in "Section 3:  Opportunities for Improvement" requiring that ICOG "update cost allocation policy manual, limit use of office space as an allocation basis where appropriate." If ICOA had any other issues with ICOG's budgeting process, it had ample opportunity to raise them.

In addition, Exhibits C.1 through C.6 of the OPE Report clearly show that expenditures for administration in Areas I, II, V, and VI regularly exceeded 10%. See Exhibit _____ attached. It is likely they also exceeded the 10% limit in SFY 2013. However, to the best of the AAA III Director's knowledge, these AAAs have not been threatened with dedesignation for falling out of compliance with the 10% limitation (or for any other non-compliance issue).

ICOA has never provided a guidelines for the AAA umbrella agencies to use to distinguish between administrative costs and program costs.  Nor has it ever required the umbrella agencies to develop a timesheet reporting system to effectuate accurate reporting of same.

Administration costs are costs associated with certain functions - such as accounting, procurement, financial management, payroll, etc. The ICOG President and the AAA III Director both engaged in administrative activities at various times.

Program costs are related to the direct provision of services. An individual such as a program director (e.g. AAA Director) can incur both program and administrative costs, depending on the function which is being performed.  For instance, when a program director is meeting with project partners to discuss how services will be designed and provided to participants, the salary associated with that time falls under program costs. However, when a project director develops a budget for a contractual agreement with a project partner, the salary associated with that time is an administrative cost, because budgeting is an administrative function.  Because of the nature of an AAA's operations, the ICOG President and the AAA III Director obviously engaged in program activities as well.

ICOA itself admits that it has been lax in its fiscal oversight of AAAs.  See page ___ of the Notice.  To now single out AAA III for dedesignation based on activities of which ICOA was fully aware is, again, nothing more than retaliation.

In addition, as noted above, ICOG fiscal staff were in the process of manually producing the financial documents requested by ICOA.  The required reports have now been completed and are available to ICOA for review.

**Decline in Services**

OPE's evaluation included a review of service trends.  To determine how reimbursement rates may have affected senior services, the evaluators looked at trends for two service categories: nutrition and transportation and found that the number of reimbursed units had declined in both categories.  Between 2005 and 2009, the trend in statewide meals was a decrease (national statistics also indicate decreasing interest in Congregate Meals services).  The evaluators suggested that the decline might be attributed to a reduced level of participation, reduced funding, or a combination of both factors.

Overall, ICOG's AAA budget has varied little since 2009 and, according to ICOA, its SFY 2004-2013 expenditure percentages have remained fairly consistent with contracted "direct" services never receiving less than 50% of AAA III's total budget.  Conversely, all of the other AAAs committed significant portions of their total budgets to their in-house services, rather than to external contracted "direct" services, thereby drastically underfunding such services and resulting in a significant decline in services in each of those regions.  See Exhibit _____ attached hereto.  Yet, ICOA has targeted ICOG for dedesignation as an AAA.



ICOA now focuses on the reduction in Congregate and Home-Delivered Meals as a basis for dedesignation. However, ICOA fails to take into account the fact that other programs have increased (e.g. Respite, Transportation, Legal Services). ICOA also fails to take into account the fact that AAA III's meal reimbursement rates have increased since 2009 as a result of standardization of reimbursement rates per the OPE Report.

ICOA also incorrectly states that various senior centers "discontinued contracting with the AAA." However, the AAA has never contracted with the referenced centers and meal sites. Instead, they were always EOA's subcontractors under the "EOA Model" called out in the OPE Report.

When EOA lost its nutrition contract, the two largest centers chose not to subcontract with the new nutrition contractor. Because they are now operating independently, they do not report meals provision to the AAA. ICOA has provided no evidence that there has been a negative impact on the target population. Since the centers and meal sites continue to independently provide meals, older individuals continue to have access to nutrition services at such sites and at other sites located in the surrounding areas.

During the first six months of SFY 2014, Home-Delivered Meals services declined and funding allocated to providers remained unspent. However, Congregate Meals services increased unexpectedly.

The AAA III queried its nutrition providers as to the reason for the decline in Home-Delivered Meals. Some stated that clients had moved in with relatives or into assisted living facilities and no longer needed meals. Others stated that the process requiring potential clients be assessed by AAA III's I & A staff using the ICAT was a contributing factor. In fact, a number of senior centers visited by the AAA III Director during the past six months stated that they continue to serve Home-Delivered Meals clients determined through ICOA's assessment process to be "ineligible." As a result, the AAA III (with ICOA's approval) amended its budget and moved funds from its providers' Home-Delivered Meals budgets to their Congregate Meals budgets.

It is correct that Homemaker units of service have declined-they have done so since at least 2009.  However, ICOA fails to account for the impact of AAA III's increase in reimbursement rates effective July 1, 2012.  In addition, ICOA claims the reduction in Homemaker units of service is a result of ICOG/AAA III's "failure to adequately fund program services."  This is incorrect.

AAA III staff spent much of the first six months of SFY 2014 implementing the program changes instituted by ICOA beginning in July 2013.  As a result, <u>although adequate funding was allocated to Homemaker services</u>, AAA staff had insufficient time to enroll additional clients in Homemaker services.  Once AAA staff were able to focus on their clients, instead of implementation of ICOA's many program changes and requirements, they had time to enroll more clients in Homemaker services and service units began increasing.  Even so, funding allocated to Homemaker services remained unspent at the end of SFY 2014 (in contrast to ICOA's claim that services were underfunded).

**Attorneys' Fees**

As noted above, ICOA claims ICOG improperly paid attorneys' fees using AAA funds.  However, during May 2012, the AAA Director sought <u>and received</u> from ICOA <u>written</u> authorization to use AAA administration funds to pay for litigation fees.  The AAA Director intended to move money from nutrition services to administration so that programs not involved in the EOA lawsuit would not be impacted.

On January 29, 2013, the AAA Director provided to ICOA copies of the letters it was going to send to its nutrition contractor regarding the budget reduction.  The ICOA did not object.  In fact, the ICOA only objected after the Governor was surprised and embarrassed at the March 27 meeting, two months <u>after</u> the AAA had provided them with the proposed letters.

Even then, the ICOA Administrator referred only to legal fees associated with ICOG's defense (which are covered by insurance), not ICOG's affirmative pursuit of damages caused by EOA's contractual breaches (which are <u>not</u> covered by insurance).  ICOA's own inconsistent guidance and subsequent failure to timely respond created an issue which could have been easily avoided.  Subsequently, ICOA approved the AAA's SFY 2014 budget which included the allocation of approximately $24,000 for legal services.  See Exhibit _____ attached hereto

**Conclusion:** None of the bases cited by ICOA merit dedesignation.  ICOG's budgeting process has been completely transparent with full disclosure to ICOA.  If ICOA had any objections to ICOG's methodology, it had many opportunities to voice them and, ultimately, to refuse to approve the AAA III budget.  In fact, several other AAAs have regularly exceeded the 10% administration limit apparently without any repercussions.

As noted above, the decline in services is attributable to a variety of reasons, some of which are now resolving themselves and others that remain outside the control of the AAA III Director.  The decline in services bears no relationship to the legal fees associated with the EOA lawsuit.

---

AREA AGENCY ON AGING
SERVING SOUTHWEST IDAHO

ECONOMIC DEVELOPMENT DISTRICT
REGION III

In addition, the AAA III Director sought and received specific guidance from ICOA regarding legal fees.  ICOA was fully informed regarding the AAA III Director's intended actions and thus should be precluded from now trying to use the AAA III Director's adherence to this guidance as a basis for dedesignation.

**III. Area Plan:  Area III has failed to timely submit the documentation necessary to obtain an approved area plan.**

In preparing the Area Plan, the AAA III Director and AAA III Advisory Council agreed that the plan should align with ICOA's own strategies, particularly where it was apparent that AAA assistance or involvement would be required for ICOA to implement a strategy.

AAA III's original Area Plan was submitted to ICOA on October 15, 2013.  The ICOA sent the AAA III Director an initial rejection of the Area Plan requesting approximately 163 corrections.  After preparing the first set of corrections, the AAA III Director requested that Sarah Toevs, PhD, Chair of the Boise State University Center for the Study of Aging, review the document.

After receiving Dr. Toevs' affirmation, the AAA III Director then submitted the revised Area Plan to the ICOA.  This triggered a process whereby the ICOA would reject the Area Plan and require new corrections, the AAA III Director would make the requested corrections and submit a new iteration of the Area Plan, and the ICOA would again reject the Area Plan with a new and set of corrections (most of which were trivial in nature and should have been identified in the first correction).  The AAA III Director heard nothing back from ICOA after submitting the sixth iteration of the Area Plan on March 27, 2014.

Because many of the required corrections were exceedingly trivial, it became an increasingly frustrating process; it was evident that the ICOA's modus operandi was to continue to identify alleged "flaws" in the document and require more "corrections."  During the AAA III Director's work on the fifth and sixth iterations, the Area Plans from AAAs II, V, and VI were approved by ICOA and posted on the AAAs' respective websites.

Copies of these Area Plans are attached hereto as Exhibits _____.  The AAA III Director evaluated the content of these plans as compared to the content "required" by ICOA to be included in AAA III's Area Plan.  It was extremely disappointing and frustrating to learn that the other AAAs were not being held to the same standard as was AAA III.  It appeared that this was another aspect of what essentially amounted to ICOA's campaign of harassment.

Most importantly, ICOA makes the following allegations to support its dedesignation of ICOG as the AAA for PSA III:

- Area III's plan fails to demonstrate that a loss or diminution in the quantity or quality of the services provided, or to be provided, under this title by such agency has not resulted and will not result from such contract or such relationship.
- There is insufficient detail showing how another layer of administration cost of a mid-management company benefits the congregate and home delivered meal programs and if this contract accounts for the decline in service.

- The AAA III did not identify the non-OAA and State funded positions in the organizational chart.

However, none of these "issues" was ever identified in the five corrective documents sent to the AAA III Director by ICOA.  Had the AAA III Director been asked, the AAA III Director would have addressed them accordingly.

**Conclusion**:  The AAA III Director addressed the many "corrections" demanded by ICOA through five subsequent iterations of the Area Plan.  Ultimately, the missing elements upon which ICOA now bases its dedesignation were never even mentioned during the Area Plan review process described above.

There is no substantial failure on the part of ICOG/AAA III to submit documents required to qualify for and obtain an approved Area Plan.  Instead, ICOA's refusal to approve AAA III's Area Plan is nothing more than an attempt to fabricate a basis upon which to dedesignate AAA III and thereby silence the IFF issue.  The AAA III Director has examined the Area Plans already approved by ICOA and they are all substantially "deficient" in one way or another with respect to the very items ICOA used as a reason to reject AAA III's various Area Plan iterations.

## IV. Area Agency on Aging

- **Area III does not meet the requirement of a separate organizational unit within a multi-purpose agency which functions only for purposes of serving as the area agency on aging**
- **Activities of the Area III AAA are inconsistent with the statutory mission prescribed in the Act and are in conflict with the requirement of the Act that it function only as an Area Agency on Aging.**

In designating an agency or office as an area agency on aging, Section 305(a)(2) of the OAA provides that the State agency shall consider the views of local governments in making such designation.

> (A) except as provided in subsection (b)(5), designate for each such area after consideration of the views offered by the unit or units of general purpose local government in such area, a public or private nonprofit agency or organization as the area agency on aging for such area; (emphasis added)

ICOA has provided no basis, legal or otherwise, to support its assertion that ICOG no longer meets the requirements of a multi-purpose agency and the area agency no longer functions as a separate organizational unit within a multi-purpose agency.

As set forth in 45 Code of Federal Regulations Section 1321.33, an area agency may be any of the types of agencies described in Section 305(c) of the OAA:

> (1) an established office of aging which is operating within a planning and service area designated under subsection (a);

(2) any office or agency of a unit of general purpose local government, which is designated to function only for the purpose of serving as an area agency on aging by the chief elected official of such unit;

(3) any office or agency designated by the appropriate chief elected officials of any combination of units of general purpose local government to act only on behalf of such combination for such purpose;

(4) any public or nonprofit private agency in a planning and service area, or any separate organizational unit within such agency, which is under the supervision or direction for this purpose of the designated State agency and which can and will engage only in the planning or provision of a broad range of supportive services, or nutrition services within such planning and service area; or

(5) in the case of a State specified in subsection (b)(5), the State agency; and shall provide assurance, determined adequate by the State agency, that the area agency on aging will have the ability to develop an area plan and to carry out, directly or through contractual or other arrangements, a program in accordance with the plan within the planning and service area. In designating an area agency on aging within the planning and service area or within any unit of general purpose local government designated as a planning and service area the State shall give preference to an established office on aging, unless the State agency finds that no such office within the planning and service area will have the capacity to carry out the area plan.

ICOG currently operates as an agency described in Section 305(c)(4) of the OAA.  As required, ICOG's AAA is a separate division of ICOG and engages only in the planning or provision of a broad range of supportive services and nutrition services within PSA III.  _In fact, ICOA has provided no evidence whatsoever that AAA III has engaged in any activities other than those related to planning or providing supportive services and nutrition services for older individuals and individuals with disabilities._

It is irrelevant for purposes of Section 305(c)(4) that member dues are ICOG's only unrestricted source of revenue.  It is also irrelevant that ICOG's other grants/contracts are small compared to the AAA's funding (and ICOA's assertion that they expire in 2014 is incorrect).

If and when ICOG no longer operates programs other than the AAA, it will no longer be operating as a multi-purpose agency.  Instead, it will, in fact, be operating as an agency described in Section 305(c)(1) of the OAA, one whose single purpose is to administer programs for older persons.  See 45 CFR § 1321.55.  It should be noted that such agencies have preference for designation as an area agency on aging.  See OAA § Section 305(c)(5) of the OAA.

ICOG has made every attempt to be transparent in its OAA/ISSA funded programs.  However, as part of ICOA's campaign of harassment, it has attempted to interfere and disrupt ICOG/AAA's efforts to increase services for seniors and individuals with disabiltities.  For example,

- Senior Health Insurance Benefit Advisors (SHIBA) offered to assign a SHIBA advisor to the AAA for several hours per week if ICOG could provide a meeting space and computer for the advisor's use.  Although ICOG had space and a computer available and hosting a SHIBA advisor would provide an excellent benefit to seniors, ICOA refused to allow ICOG to host an advisor unless ICOG charged SHIBA for the space and computer.
- Idaho Legal Aid Services approached AAA III to partner on a Benefit Enrollment Center grant to fund a coordinated, community-wide approach to find and enroll both seniors aged 65+ years and adults living with disabilities, aged 21-64, who have limited income and resources in available benefits.  ICOA refused to allow AAA III to use Case Manager time as a potential match even though such positions were funded with state dollars and such funding exceeded the amount necessary to match federal OAA funding.

ICOA has consistently encouraged AAAs to pursue business opportunities that will support senior services.  That is exactly what ICOG and the AAA III Director have attempted to do; the activities in which they are engaging are for services that directly benefit seniors and individuals with disabilities.  For ICOA to now claim that ICOG/AAA's efforts to carry through ICOA's own expressed desire as a basis for dedesignation is absurd and without any foundation whatsoever.  In addition, ICOA's attempts to interfere in these activities are overreaching and outside its jurisdiction.  ICOA has no authority over non-ICOA funded activities.

Further, ICOA's claim that it "must ensure that Area III funds aren't being used as advances for non-OAA and SSA services" is completely without foundation.  ICOA does not advance ANY funds to the AAA.  ICOA does not need ICOG's contractual information to ensure ICOA funds are not being used for non-ICOA activities.  ICOA can easily examine ICOG's staff timesheets.  ICOG's timesheet templates contain coding and entry columns for all ICOG staff activities, both ICOA-funded and otherwise.  ICOG staff separately enter their time for each activity.  To try to justify its attempt to dedesignate the AAA on this basis is, again, totally retaliatory and without foundation.

**Conclusion:**  ICOG/AAA III fully meets the requirement of operating as a separate organizational unit within a multi-purpose agency.  If or when it no longer operates as a separate organizational unit, it will function as an established office of aging.  In either event, ICOG is completely in compliance with the requirements of Section 305(c) of the OAA.

## SUMMARY

ICOA and the AAAs are most certainly accountable for delivering programs and services to ensure seniors and person with disabilities remain in their homes, in the communities of their choice, and lead healthy and independent lives.  Historically, it has been a coordinated effort between ICOA and the AAAs to do just that.

In fact, the AAA III Director previously served as the ICOA Program Operations Manager for almost eight years.  In this capacity, the AAA III Director provided technical assistance, advice, and training to AAA staff; and collaborated regularly with the then AAA III Directors, Pearl Bouchard, Jenny Zorens, Lori Brelia, Jim Fields, Sister Anthony Marie Greving, and Matt Queen.

Subsequent to the AAA III Director (then ICOA Program Operations Manager) leaving the ICOA to join the Idaho Coalition Against Sexual & Domestic Violence, the remaining AAA Directors nominated her for appointment to the Advisory Board on Elder Abuse, Neglect, and Exploitation established by the federal Elder Justice Act. It seems obvious that this nomination would not have been made if the AAA III Director had not developed a good working relationship with the then AAA III Directors.

To say that the AAA III Director is very disappointed in her colleagues' current conduct would be an understatement.  Although she understands that, with the example the ICOA Administrator and Deputy Administrator are trying to make through their current campaign to dedesignate ICOG, the AAA Directors do not to any great extent have any choice but to give their "support." It is interesting to compare their current "support" with the views expressed in the attached e-mails referenced above.  The AAA III Director also understands that the AAAs that are at risk of losing funds have great motivation to support ICOA's actions and obviously will go to great lengths to prevent a funding formula change.

ICOA's effort to dedesignate ICOG as the AAA is nothing more than continued retaliation against ICOG and the AAA III Director for their advocacy on behalf of the seniors living in their region and an attempt to silence the IFF issue once and for all.