# UNITED STATES DISTRICT COURT

## DISTRICT OF IDAHO

| | |
|---|---|
| KENDRA KENYON,<br><br>     Plaintiff,<br><br>     vs.<br><br>C.L. "BUTCH" OTTER, Governor of Idaho, in his individual capacity, *et al.*,<br><br>     Defendants. | Case No.: 1:15-cv-00060-REB<br>     (Lead case)<br>     1:15-cv-00061-REB<br>     (Companion case)<br><br>**MEMORANDUM DECISION AND ORDER** |
| SARAH E. SCOTT,<br><br>     Plaintiff,<br><br>vs.<br><br>C.L. "BUTCH" OTTER, Governor of Idaho, in his individual capacity, *et al.*,<br><br>     Defendants. | |

     Currently pending before Court are Defendants' Motions to Dismiss (Dkts. 9, 28) in this consolidated case.  Having heard oral argument and being otherwise advised, the Court enters the following memorandum decision and order.

**MEMORANDUM DECISION AND ORDER - 1**

**BACKGROUND**

**A.     Older Americans Act and the Idaho Commission on Aging**

The federal Older Americans Act ("OAA") requires states to designate a state agency as a "state unit on aging".  (*Kenyon v. Otter*, Case No. 1:15-cv-00060, Complaint, Dkt. 1 "Kenyon Compl.", ¶¶ 10-12.)   In Idaho, that is the Idaho Commission on Aging (the "Commission") in the Executive Office of the Governor.  (*Id*. at ¶ 12.)   In turn, the Commission designates "Area Agencies on Aging" ("AAAs") for each "Planning and Service Area" ("PSA") within a state. (*Id*. at ¶¶ 11, 13.)  Six Planning and Service Areas are designated in Idaho, of which "PSA III" is the largest.  PSA III consists of ten counties in southwest Idaho.  (*Id*. at ¶ 14.)  The designated AAA for PSA III since approximately 1972 (and until the events underlying this lawsuit) had been the Idaho Council of Governments ("ICOG")[1],  an Idaho non-profit corporation.  (*Id*. at ¶ 15.)

As the Area Agency on Aging for PSA III, ICOG received both federal and state funding to deliver services under the Older Americans Act and the Idaho Senior Services Act.  (*Id*. at ¶ 16.)  The allotment of funds the Commission receives from the federal Administration on Aging is based upon Idaho's proportion of the total U.S. population aged 60 or older, but cannot be less than a minimum set by statute.  (*Id*. at ¶ 18.)  The amount of funding provided by the Commission to ICOG and other AAAs in Idaho is determined through application of the federally required "Intrastate Funding Formula" (the "Formula").  (*Id*. at ¶ 20.)

---

[1]  The official name of ICOG is "Ida-Ore Planning and Development Association, Inc." which does business as "Idaho Council of Governments."  (*Id*. at ¶ 5.)

**MEMORANDUM DECISION AND ORDER - 2**

**B.      Idaho's Intrastate Funding Formula**

Plaintiff Kendra Kenyon ("Kenyon"), who was President of ICOG during the relevant time frame, and Plaintiff Sarah Scott ("Scott"), Director of ICOG during the relevant time frame (collectively, "Plaintiffs"), contend that Idaho's Formula failed to comply with federal law in that it failed to properly consider the geographical distribution of older individuals in the state and failed to properly consider the distribution of individuals aged 60 and older with physical and mental disabilities, all in violation of Section 305(a)(2)(C) of the OAA.[2]  (*Id.* at ¶ 22.) Plaintiffs allege that Idaho's Formula calculation fails to include the general population of Idahoans aged 60 and older and makes inaccurate funding of AAAs, other than PSA III, in Idaho

---

[2]  Section 305(a)(2)(C) of the OAA requires that the Formula be developed:

> in consultation with area agencies, in accordance with guidelines issued by the Assistant Secretary, and using the best available data, develop and publish for review and comment a formula for distribution within the State of funds received under this title that takes into account - (i) the geographical distribution of older individuals in the State; and (ii) the distribution among planning and service areas of older individuals with greatest economic need and older individuals with greatest social need, with particular attention to low-income minority older individuals . . .

Section 201(a) of the OAA defines "great economic need" as "the needs resulting from an income level at or below the poverty line."  That same section defines "greatest social need" as:

> the need caused by non-economic factors which include -
> (A) physical and mental disabilities
> (B) language barriers; and
> (C) cultural, social, or geographical isolation, including isolation caused by racial and ethnic status, that -
> > (I) restricts the ability of an individual to perform normal daily tasks; or
> > (ii) threatens the capacity of the individual to live independently.

**MEMORANDUM DECISION AND ORDER - 3**

where the per capita cost is higher, meaning that fewer seniors are serviced in Idaho overall.  (*Id.* at ¶¶ 23, 25.)  Plaintiffs further allege that Idaho's Formula is a matter of broad public concern because PSA III, as well as other PSAs, are underfunded and  have been required to maintain waiting lists for persons seeking services.  (*Id.* at ¶ 26.)  It is further contended that ICOG Directors and staff have long been concerned that Idaho's Formula does not comply with federal law and that the Commission spends too much funding on administration, rather than providing money to various state AAAs.  (*Id.* at ¶ 27.)

**C.      2014 Budget and Concerns Over the Formula**

ICOG submitted its SFY 2014 budget to the Commission on June 27, 2013.  (*Id.* at ¶ 28.) The budget called for PSA III to pay 35% of Kenyon's (ICOG's President) salary from AAA administrative funds received from the Commission.  (*Id.*)   The Commission, through its director, Defendant Sam Haws, approved this budget on June 30, 2013.  (*Id.*)  In the past, the Commission had approved budgets with a much higher percentage of the PSA III President's salary coming from AAA administrative funds.  (*Id.*)

In June and July of 2013, Kenyon attempted to raise with Haws the issue of the allegedly non-compliant Formula and the excessive administrative funds retained by the Commission.  (*Id.* at ¶¶  29-30.)  Kenyon met several times with Patrick Sullivan of Sullivan and Reberger, an Idaho lobbying and campaign consulting firm.  (*Id.* at ¶ 32.)  In these meetings, Kenyon explained her allegations regarding the non-compliant Formula and excessive administrative funds retained by the Commission.  (*Id.*)  Mr. Sullivan then discussed Kenyon's concerns with Tammy Perkins, the Senior Special Assistant for Health and Social Services with the Office of the Governor, as well as David Hensley, Chief of Staff to the Governor.  (*Id.*).  Haws learned

**MEMORANDUM DECISION AND ORDER - 4**

about Kenyon's meetings with Mr. Sullivan and his subsequent contact with Ms. Perkins and Mr. Hensley.  (*Id*.)  On July 11, 2013, Kenyon and Scott had a meeting with Haws in which Kenyon again tried to discuss the Formula.  Haws insisted that such matters were for the Commission's decision alone.  (*Id*. at ¶ 31.)

On August 23, 2013, Kenyon and Scott met with Haws and her deputy, Jeff Weller, and various ICOG staff and board members.  They raised these issues again.  (*Id*. at ¶ 34.)  Haws said she would get back to ICOG personnel but never did.  (*Id*.)

**D.      Reduction in Contribution to ICOG President's Salary and Aftermath**

On September 16, 2013, Haws sent ICOG's Director of Finance an email.  She said that the Commission's AAA contribution to Kenyon's salary was being reduced to 10%.  (*Id*. at ¶ 35.)  In response, the ICOG Board of Directors sent a letter to the Governor addressing their concerns regarding the actions of Haws.  (*Id*. at ¶ 36.)  Kenyon and Scott drafted the letter, and several drafts circulated to the ICOG Board of Directors before the final version, dated November 14, 2013, was provided to the Governor (hereafter, the "November Letter").  In part, the Board of Directors said:

> In addition we are offended by Ms. Haws' baseless reduction of ICOG's President's percentage allocation of time in our AAA budget.  Our President's percentage allocation as set forth in our AAA budget was initially approved in writing by Ms. Haws on June 27, 2013.  During at meeting at our office on August 23, 2013, our Board Chair and President attempted to discuss with Ms. Haws and her deputy a variety of issues, including the statutorily non-compliant intrastate funding formula.  Soon thereafter, apparently in retaliation for asking these questions, Ms. Haws arbitrarily and without foundation reduced our President's time allocation (funding) so significantly that we are being forced to terminate our President's employment effective January 1, 2014.
>
> It is alarming that the reduction in funding resulting in the loss of

**MEMORANDUM DECISION AND ORDER - 5**

> this executive's employment happened only after potential
> statutory violations were brought to [the Commission]'s attention.
> For decades, the allocation was never an issue, and for the year in
> question the budget had already been approved.  There is a clear
> nexus between what appears to be legitimate AAA advocacy
> activities and Ms. Haws' tortious interference with the contractual
> expectation of this executive and her right to free speech. . .
>
> We believe the senior citizens in southwest Idaho would be
> outraged that our region is not receiving the funding to which it is
> entitled under the Older Americans Act and that [the Commission]
> is making unilateral decisions that are not in the best interests of
> Idaho's aging network and those we serve.
>
> We respectfully request that you appoint to the critical position of
> [Commission] Administrator someone who has the passion,
> educational background, and expertise needed to serve our valued
> senior citizens.

(*Id*. at ¶¶ 36-38.)

This letter was signed by the Board chair and vice-chair, and 19 Board Members and Members-at-Large.  (*Id*., Ex. B.)   This list did not include Kenyon and Scott.   Defendant Haws and Commissioner Defendants Carey Spears, David Pankey, Lorraine Elfering, David Maestas, Sharon Sturm, Coleen Erickson, and Victor Watson (collectively, the "Commissioner Defendants") were provided a copy of the November Letter and are alleged to have known of Plaintiffs' role in drafting the letter.  (*Id*. at ¶ 40.)

After delivery of the November Letter to the Governor, Scott prepared "talking points" regarding the Formula, which were distributed to seniors in PSA III and to others asking them to advocate for correction of the formula ("the Constituent Talking Points").  (*Id*. at ¶ 44.)

Allegedly because of the reduction in the Commission's contribution to her salary, ICOG terminated Kenyon's employment effective January 1, 2014.  (*Id*. at ¶ 41.)  On January 14, 2014, ICOG entered into a Consultant Agreement with Kenyon by which she continued to provide

**MEMORANDUM DECISION AND ORDER - 6**

services to ICOG, although unrelated to its role as the PSA III Area Agency on Aging.  She was paid much less.  (*Id*. at ¶ 42.)

On or about January 8, 2014, Scott submitted a public records request  to the Commission relating to the data utilized in development of the Formula.  (*Scott v. Otter et al.*, Case No. 1:15-cv-00061-REB, Compl., Dkt. 1, "Scott Compl." ¶ 42.)  Prior to the Commission's presentation to the Idaho Legislature's Joint Finance and Appropriations Committee  ("JFAC")  on January 17, 2014, Scott prepared and delivered separate "talking points" to JFAC members in a letter dated January 13, 2014.  (*Id*. at ¶ 43.)

On January 30, 2014, Scott and other ICOG Board Members met with Lt. Governor Brad Little and Tammy Perkins of the Office of the Governor.  (*Id*. at ¶ 47.)  Defendant Little indicated that Governor Otter had asked him to address the issues raised in the November Letter.  (*Id*.)  During this meeting, Defendant Little said he was displeased by Scott's Public Records Request.  (*Id*.)

On February 6, 2014, the Commissioner Defendants met at a quarterly meeting, which Scott attended.  Based on a report Haws submitted to the Commissioner Defendants regarding the November Letter, the Commissioner Defendants voted to demand that the ICOG Board dismiss or sanction Scott.  (*Id*. at ¶ 48.)  Scott then made under another Public Records Request for an audio recording of the February 6, 2014 meeting.  (*Id*. at ¶ 49.)

Between January and May, 2014, Haws allegedly unduly delayed approval of budget amendments, arbitrarily varied the processes by which Scott and ICOG were required to seek other approvals, made excessive and repeated demands on Scott and ICOG for information, and subjected Scott and ICOG's operations and procedures to examination and standards not

**MEMORANDUM DECISION AND ORDER - 7**

required of other AAAs.  (*Id*. at ¶ 50.)

**E.      Dedesignation[3] of ICOG**

On May 30, 2014, Defendant Haws notified ICOG by letter that the Idaho

Commission on Aging was not renewing the AAA Performance Based Agreement with PSA III

and further was initiating a proceeding to withdraw PSA III's designation as an AAA (referred tp

as a "Notice of Proposed Dedesignation").  (Answer, Ex. E, Dkt. 7-6.)  The dedesignation was to

take effect at the end of June 30, 2014.  (*Id*.)  Several grounds were offered as justification:  (1)

ICOG's activities were inconsistent with the statutory mission of the OAA and in conflict with

the requirement that it function only as an area on aging; (2) there was substantial failure in the

provisions and administration of ICOG's approved area plan to comply with the Older

Americans Act, and misallocated funds to administration, thereby reducing available funds for

services; and (3) ICOG had failed to timely submit the documentation necessary to obtain an

approved area plan.  (*Id*.)  ICOG was told it could request a public hearing with the Commission

on the de-designation action and appeal the decision to the Assistant Secretary for Aging.  (*Id*.)

On July 1, 2014, the Commission took over what was previously PSA III's responsibility

for services under the OAA.  (Scott Compl., § 56.)  Scott's involvement with ICOG was

terminated on November 8, 2014.  (*Id*. at ¶ 56.)

///

///

///

---

[3] Both "de-designation" and "dedesignation" are used in the parties' brief.  The Court
will use "dedesignation".

**MEMORANDUM DECISION AND ORDER - 8**

## STANDARD OF REVIEW
## MOTION TO DISMISS/JUDGMENT ON THE PLEADINGS

Scott and Kenyon bring § 1983 claims[4] against Defendants Haws, Governor Otter,

Spears, Pankey, Elfering, Maestas, Strum, Erickson, and Watson.  Scott also brings a § 1983

claim against Defendant Lieutenant Governor Little; state law claims of interference with

contract and intentional interference with prospective economic advantage against Defendant

Haws; and a reckless and/or negligent supervision claim against Defendants Otter, Little, Spears,

Pankey, Elfering, Maestas, Strum, Erickson, and Watson.

Motions for a judgment on the pleadings fall under by Federal Rule of Civil

Procedure 12(c). The principal difference between Rule 12(b) and Rule 12(c) motions is the time

of filing.  *Dworkin v. Hustler Magazine, Inc*., 867 F.2d 1188, 1192 (9th Cir. 1989). A party may

move for judgment on the pleadings at any point after the pleadings close. Fed. R. Civ. P. 12(c).

"Because the motions are functionally identical, the same standard of review applicable to Rule

12(b) motions applies to its Rule 12(c) analog." *Id.*

Both the Rule 12(b)(6) and 12(c) motions challenge the legal sufficiency of a plaintiff's

claims. *Conservation Force v. Salazar*, 646 F.3d 1240, 1242 (9th Cir. 2011).  The inquiry asks

whether the plaintiff's allegations are sufficient under Rule 8(a), which contains the  minimum

pleading requirement that the plaintiff provide a "short and plain statement of the claim showing

that the pleader is entitled to relief," and "give the defendant fair notice of what the ... claim is

and the grounds upon which it rests."  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

When reviewing a motion to dismiss, all non-conclusory, factual (not legal) allegations

---

[4]  42 U.S.C. § 1983.

**MEMORANDUM DECISION AND ORDER - 9**

made in the complaint are accepted as true, *Ashcroft v. Iqbal*, 565 U.S. 662, 678–79 (2009);

*Erickson v. Pardus*, 551 U.S. 89 (2007), and all reasonable inferences are drawn in favor of the

non-moving party, *Mohamed v. Jeppesen Dataplan, Inc.*, 579 F.3d 943, 949 (9th Cir. 2009).

"While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual

allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires

more than labels and conclusions, and a formulaic recitation of the elements of a cause of action

will not do." *Iqbal*, 565 U.S. at 678 (citing *Twombly*, 550 U.S. at 555).  A complaint must

contain sufficient factual allegations to provide plausible grounds for entitlement to relief.

*Twombly*, 550 U.S. at 555–56. "A claim has facial plausibility when the plaintiff pleads factual

content that allows the court to draw the reasonable inference that the defendant is liable for the

misconduct alleged."  *Iqbal*, 565 U.S. at 678.

   As a general rule, evidence outside the pleadings is not considered unless the motion is

converted to a summary judgment motion.  *See* Fed. R. Civ. P. 12(b); *United States v. Ritchie,*

342 F.3d 903, 907–908 (9th Cir. 2003).  The exceptions to that general rule include that the court

may "consider certain materials or documents attached to the complaint, documents incorporated

by reference in the complaint, or matters of judicial notice-without converting the motion to

dismiss into a motion for summary judgment."  *Id*. at 908 (citing *Van Buskirk v. CNN*, 284 F.3d

977, 980 (9th Cir. 2002); *Barron v. Reich*, 13 F.3d 1370, 1377 (9th Cir. 1994); 2 James Wm.

Moore et al., Moore's Federal Practice § 12.34[2] (3d ed.1999)).[5]

---

[5] Plaintiffs argue the Court should disregard and exclude any materials from Defendants'
Answers (Dkt. 5, 6) or if they are considered, this motion should be converted to one for
summary judgment.  (Pls.'s Resp., Dkt. 24, p. 5.)   A court may properly consider documents
attached to the complaint, documents incorporated by reference in the complaint, or matters of
judicial notice, without converting the motion to dismiss into a motion for summary judgment.

**MEMORANDUM DECISION AND ORDER - 10**

# DISCUSSION[6]

## A.    Claims Based on the Dedesignation are Barred by Absolute Immunity

Defendant Haws seeks the umbrella of absolute immunity from liability for her

involvement in the "Notice of Proposed Dedesignation" and "Order of Withdrawal of AAA

Designation."  Absolute immunity is generally accorded to judges and prosecutors functioning in

_____

*See Van Buskirk v. CNN*, 284 F.3d 977, 980 (9th Cir. 2002); *Barron v. Reich*, 13 F.3d 1370, 1377 (9th Cir.1994); 2 James Wm. Moore et al., Moore's Federal Practice § 12.34[2] (3d ed. 1999). Defendants contend that the documents attached to its answers and motion could be considered under either the doctrine of incorporation by reference or the doctrine of judicial notice.
Certain written instruments attached to pleadings also may be considered part of the pleading. See Fed. R. Civ. P. 10(c). Even if a document is not attached to a complaint, it may be incorporated by reference into a complaint if the plaintiff refers extensively to the document or the document forms th e basis of the plaintiff's claim. *See Van Buskirk*, 284 F.3d at 980; *Branch v. Tunnell*, 14 F.3d 449, 453–54 (9th Cir. 1994), overruled on other grounds by *Galbraith v. County of Santa Clara*, 307 F.3d 1119 (9th Cir. 2002); *Venture Assoc. Corp. v. Zenith Data Systems Corp.*, 987 F.2d 429, 431(7th Cir.1993). The defendant may offer such a document, and the district court may treat such a document as part of the complaint, and thus may assume that its contents are true for purposes of a motion to dismiss under Rule 12(b)(6). The doctrine of incorporation by reference may apply, for example, when a plaintiff's claim about insurance coverage is based on the contents of a coverage plan, *see Parrino*, 146 F.3d at 705–06, or when a plaintiff's claim about securities fraud is based on the contents of SEC filings, *see In re Silicon Graphics Secs. Litig.*, 183 F.3d 970, 986 (9th Cir.1999).

The documents the Court has relied upon, and cited to, in this decision include the "Notice of Proposed Dedesignation" letter from Haws to ICOG (Defs' Answer, Ex. 4, Dkt. 5-5), ICOG's Withdrawal of Appeal (*Id.*, Ex. 5, Dkt. 5-6), and the Order of Withdrawal of AAA Designation (*Id.*, Ex. 6, Dkt. 5-7).  These are properly considered under the standards described above, as Plaintiffs refer to them extensively in their complaints and they form the basis for the claims, at least in part.

[6]  Much of Defendants' opening brief focused on whether Plaintiffs had stated a claim under 42 U.S.C § 1983 based on a federal statute (the Older Americans Act) that created an individual right.  (*See* Defs.' Mem., Dkt. 9-1 at 4-9.)  Defendants' argued there were no individual rights created by the OAA.  Defendants mischaracterize Plaintiffs' claims.  Plaintiffs allege a violation of their rights to free speech and to be free from retaliation.  The Court need not address such arguments because Plaintiffs' claims are based on the U.S. Constitution, not any rights under the Older Americans Act.

**MEMORANDUM DECISION AND ORDER - 11**

their official capacities.  *Stump v. Sparkman*, 435 U.S. 349, 364 (1978); *Imbler v. Pachtman*, 424 U.S. 409, 430-31 (1976).  Courts have extended the protections of absolute immunity to some state officials, in particular circumstances, when those officials are sued under 42 U.S.C. § 1983.  *Miller v. Gammie*, 335 F.3d 889, 895-96 (9th Cir. 2003).  Further, absolute immunity is also available in some circumstances to government agency representatives performing functions analogous to those of a prosecutor or judge.  *Id*. at 898.  Such immunity protects the independence of executive officials acting in a quasi-judicial capacity, allowing them to exercise their adjudicative discretion without fear of intimidation or harassment.  *Butz v. Economou*, 438 U.S. 515-17, (1978).

Whether an executive official is entitled to absolute immunity is determined by examining similarities and dissimilarities of an agency's functions with that of the judicial process, by using a "functional approach."  *Cleavinger v. Saxner*, 474 U.S. 193, 201 (1985) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 810 (1982)).  In shorthand, the question is whether the official's actions are "functionally comparable" to that of a judge or prosecutor.  *Butz*, 438 U.S. at 513. In *Cleavinger*, the Supreme Court described such characteristics of the judicial process in this manner:

> [(a)] the need to assure that the individual can perform his functions without harassment or intimidation; (b) the presence of safeguards that reduce the need for private damages actions as a means of controlling unconstitutional conduct; (c) the [agency's] insulation from political influence; (d) the importance of precedence; (e) the adversary nature of the process; and (f) the correctability of error on appeal."

*Cleavinger*, 474 U.S. at 202.

The Ninth Circuit has issued a decision upon similar facts to this case, also involving an Idaho executive branch agency.  *See, Olsen v. Idaho State Board of Medicine*, 363 F.3d 916 (9th

**MEMORANDUM DECISION AND ORDER - 12**

Cir. 2004), which is discussed to follow.  After considering the holding in such decisions against the factual record of this case as they pertain to the Dedesignation Notice, the Court is persuaded as a matter of law that Haws was exercising quasi-judicial authority and is entitled to absolute immunity.

### 1.       Performance of Functions without Harassment or Intimidation

In *Olsen*, the Ninth Circuit ruled that the disciplinary duties of the Idaho State Board of Medicine and the Idaho State Board of Professional Discipline in regard to physicians and other health care providers, including the revocation of professional licenses, were duties that understandably – if exercised – would prompt lawsuits for damages.  In that setting, absolute immunity was appropriate for the same reasons as for judges and prosecutors – to ensure that the individuals performing these functions are protected from harassment and intimidation.  *Olsen*, 363 F.3d at 924.  This factor weighs in favor of absolute immunity.  Similar to the health providers who may lose their licenses or jobs considered in *Olsen*, dedesignation may result in certain individuals losing their jobs, organizations losing their mission, and substantial, if not total, reductions in funding sources. In various degrees, those impacts occurred in this case, all alleged to have resulted from dedesignation.   And, as is self-evident, those impacts have led to the damage claims raised in these lawsuits.

### 2.       Safeguards Which Reduce the Need for Private Actions

The Commission operates under an extensive set of statutes and regulations, including: the Older Americans Act ( 42 U.S.C. § 3001 *et seq*.); Idaho Senior Services Act (Idaho Code § 67-5001 *et seq*.); 45 C.F.R. Part 1321; and the Idaho Administrative Procedures Act ("IDAPA")  15.01.20 (the Rules of the Commission's Governing Area Agency on Aging (AAA)

**MEMORANDUM DECISION AND ORDER - 13**

Operations).

The Older Americans Act contains the procedures for revoking the designation of an

AAA.  *See* 42 U.S.C. § 3025(b)(5)(C)(ii).  The procedures include:

- providing notice of an action or proceeding;
- documenting the notice for the action or proceeding;
- conducting a public hearing for the action or proceeding;
- involving area agencies on aging, service providers, and older individuals in the action or proceeding;
- allowing an appeal of the decision to the Assistant Secretary.

*Id*.

Defendant Haws issued the notice of proposed de-designation. She also signed the order

of withdrawal. The decision to initiate administrative proceedings is very much like a

prosecutor's decision to bring criminal charges.  *Butz*, 438 U.S. at 515.  The discretion exercised

by executive officials in this regard would be distorted if their immunity from potential damage

claims was less than complete.  *Id*.  Morever, when the proceeding in question provides

sufficient checks on agency zeal, those officials "who are responsible for the decision to initiate

or continue a proceeding subject to agency adjudication" are entitled to immunity from damages

for their parts in that decision.  *Id*. at 516.

Plaintiffs argue that Haws only signed the order and final notice and therefore, she was

acting only as a regulator and not in a manner similar to that of a prosecutor or a judge.  Only the

Commission, in Plaintiffs' view, acts in an adjudicatory role.  The Court disagrees. Haws was

involved in identifying and evaluating whether the agency should be dedesignated, and was

involved in presenting the proceeding to the Commission for decision.  Such actions were, at

their core and notwithstanding the otherwise seldom-invoked procedure involved, adjudicative in

**MEMORANDUM DECISION AND ORDER - 14**

nature, not regulatory or ministerial.  This factor favors immunity.

### 3.        Insulation from Political Influence

The next factor from *Butz* and *Olsen* asks whether the procedural requirements of the

challenged decision-making action are sufficiently insulated from political influence.  In this

case, the revocation of "AAA" designation requires notice, documentation of the need for the

action, a public hearing, and the ability to appeal.  42 U.S.C. § 3025(b)(5)(C); *see also* IDAPA

15.01.20.021.  These requirements are nearly identical to the procedures at play in *Olsen v.*

*Idaho State Board of Medicine*, which required notice, full disclosure of facts, and an

opportunity to respond and present evidence and argument.  363 F.3d at 925.  In *Olsen*, the court

found that these procedural safeguards sufficiently insulted from political pressures.  *Id*.  For the

same reasons as in *Olsen*, Haws's decision to issue a notice of proposed dedesignation is

sufficiently insulated from political influence.

### 4.        Remaining Factors: Precedent, Adversariness, and Correctability

These factors augur both directions.  Precedence does not favor immunity.  There is no

agency system for archiving other orders and notices of dedesignation and the process of

dedesignation is rare.  Adversariness does favor immunity, as the Notice of Proposed

Dedesignation described the opportunity for ICOG to request a public hearing governed by the

IDAPA, with ICOG having the opportunity to provide testimony and documentation.  (*See* Dkt.

7-6, p. 12.)  The "appeal," or "correctability," factor also favors immunity as the final decision to

withdraw AAA designation could be appealed to the Assistant Secretary for Aging in the

Department of Health and Welfare.

**MEMORANDUM DECISION AND ORDER - 15**

5.        **Conclusion**

On balance, the factors favor the application of absolute immunity to Haws's role in the

dedesignation. The "functional approach" described by the Supreme Court emphasizes the nature

of the function performed, not necessarily the identity of the person performing the function.

*Buckley v. Fitzsimmons*, 509 U.S. 259, 269 (1993).  Here, the notice of proposed dedesignation

signed by Defendant Haws contained a thorough discussion of the legal authority for the

dedesignation action, the background leading up to the decision, and the grounds for the

dedesignation.  (*See* Dkt. 7-6).  Multiple citations to exhibits are contained in the document, in

support of the decisions contained in the notice.  Haws did not "merely sign" this notice.

When individuals in administrative agencies  perform prosecutorial and quasi-judicial

duties in adversarial proceedings which carry similar safeguards to those found in court actions,

then those individuals are entitled to absolute immunity against damage claims based upon such

actions.  *See Romano v. Bible*, 169 F.3d 1182, 1186 (9th Cir. 1999).  Haws is entitled to absolute

immunity from Plaintiffs' claims related to the dedesignation.

**B.        Defendants Are Not Entitled to Qualified Immunity at This Stage**

1.        **Qualified Immunity Standard**

Even if a prima-facie showing of a constitutional violation under § 1983 can be made by

a plaintiff, the defendant may still be entitled to summary judgment on the basis of qualified

immunity. The doctrine of qualified immunity protects state officials from personal liability for

actions taken by an official, so long as the conduct is objectively reasonable and does not violate

clearly-established federal rights.  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

Conversely, a state official may be held personally liable in a § 1983 action if that official

**MEMORANDUM DECISION AND ORDER - 16**

knew or should have known that he or she was violating a plaintiff's clearly-established rights.

*Id*.  The qualified immunity standard "gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law." *Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (quotation omitted).

A qualified immunity analysis consists of two prongs: (1) whether, "[t]aken in the light most favorable to the party asserting the injury, . . . the facts alleged show the [defendant's] conduct violated a constitutional right"; and (2) whether that right was clearly established. *Saucier v. Katz*, 533 U.S. 194, 201 (2001), modified by *Pearson v. Callahan*, 555 U.S. 223, 129 S. Ct. 808 (2009).  Although generally considered in that sequence, courts may "exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand."  *Pearson*, 129 S. Ct. at 818.

To determine whether the right was clearly established, a court first examines Supreme Court and Ninth Circuit law existing at the time of the alleged act.  *Osolinski v. Kane*, 92 F.3d 934, 936 (9th Cir. 1996).  If there is no binding precedent, the trial court considers relevant decisions of other circuits and district courts to ascertain whether the law is clearly established. *Id*.

The inquiry into whether a right was clearly established "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Saucier*, 533 U.S. at 201. "The contours of the right must be sufficiently clear that a reasonable official would understand" that his or her conduct violates that right.  *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). That does not require, however, that the "very action in question has previously been held

**MEMORANDUM DECISION AND ORDER - 17**

unlawful," but rather that "in the light of pre-existing law the unlawfulness must be apparent" to the official. *Id.* "The relevant, dispositive inquiry is whether it would be clear to a reasonable [defendant] that his conduct was unlawful in the situation he confronted." *Saucier*, 533 U.S. at 202 (citing *Wilson v. Layne*, 526 U.S. 603, 615 (1999)).

### 2. Discussion

"Public employees do not surrender all their First Amendment rights by reason of their employment." *Garcetti v. Ceballos*, 547 U.S. 410, 417 (2006.) "Rather, the First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern." *Id.*

An independent contractor who provides services to the government is treated similarly to a public employee in deciding whether there has been a violation of First Amendment rights. *Bd. of Cnty. Comm'rs v. Umbehr*, 518 U.S. 668, 673-674 (1996). In *Umbehr*, the Supreme Court emphasized the similarities between an independent contractor and a public employee, finding important but competing interests in the independent contractor's ability to pursue and obtain valuable government contract work and in the government's right to terminate an independent contractor for poor performance, to improve efficiency, or to prevent the appearance of corruption. *Id.* at 674. The Court ruled that independent contractors are entitled to First Amendment protections against retaliatory government action, and the Court held that the so-called "*Pickering* test determines the extent of their protection."[7] *Id.* at 673.

The *Pickering* test is a five-factor inquiry: (1) whether the plaintiff spoke on a matter of

---

[7] *Pickering v. Bd. of Educ.*, 391 U.S. 563 (1968), is the seminal Supreme Court decision which first held that citizens do not surrender their First Amendment rights by accepting public employment.

**MEMORANDUM DECISION AND ORDER - 18**

public concern; (2) whether the plaintiff spoke as a private citizen rather than a public employee; (3) whether the plaintiff's protected speech was a substantial or motivating factor in the adverse employment action; (4) whether the state had an adequate justification for treating the employee differently from other members of the general public; and (5) whether the state would have taken the adverse employment action even absent the protected speech. *Eng v. Cooley*, 552 F.3d 1062, 1070 (9th Cir. 2009). Once plaintiff meets the first three steps, the burden shifts to the employer to escape liability at either step four or five. *Karl v. City of Mountlake Terrace*, 678 F.3d 1062, 1068 (9th Cir. 2012).

###     a.      Public Concern

Public funding decisions, including misuse of public funds, are matters of public concern. *See Pickering*, 391 U.S. at 571; *Johnson v. Multnomah County*, 48 F.3d 420, 425 (9th Cir. 1995) (misuse of public funds is a matter of public concern); *Roth's v. Veteran's Admin.*, 856 F.2d 1401, 1405 (9th Cir. 1988). Plaintiff allege that their protected speech involved the misallocation of federal funds by the Commission and their allegations sufficiently contend that they spoke out on a matter of public concern. *See Webb v. County of Trinity*, 734 F. Supp. 2d 1018, 1028 (E.D. Cal. 2010) (it was a matter of public concern when plaintiff spoke out that her department was underfunded because federal funds had been misallocated).

###     b.      Speech as a Private Citizen or Public Employee

To qualify as protected speech, it must be "uttered" as a citizen, and not "pursuant to . . . official duties." *Martable v. Nitchman*, 511 F.3d 924, 929 (9th Cir. 2007). This is a mixed question of law and fact. "A public employee's speech is not protected by the First Amendment when it is made pursuant to an employee's official job responsibilities." *Karl,* 678 F.3d at 1068.

**MEMORANDUM DECISION AND ORDER - 19**

Conversely, a public employee's speech on a matter of public concern is protected "if the speaker 'had no official duty' to make the questioned statement, . . . or if the speech was not the product of 'performing the tasks the employee was paid to perform.'" *Posey v. Lake Pend Oreille Sch. Dist. No. 84*, 547 F.3d 1121, 1127 n. 2 (9th Cir. 2008).

In this case, the record is not entirely clear whether or not there was an official duty of either Plaintiff to communicate with the Governor or Lieutenant Governor, or to retain and communicate with an outside consulting and lobbying firm, regarding the allegedly non-compliant Formula and the alleged retention of excessive funding by the Commission.  When a factual dispute exists regarding the scope of an employee's duties, the court cannot decide the issue on a limited record.  *See Webb v. County of Trinity*, 734 F. Supp. 2d 1018, 1030 (E.D. Cal. 2010) (on a rule 12(b) motion, court assumed that speech was *not* made pursuant to official duties); *McGuire v. Washington*, 2010 WL 1286830 (W.D. Wash. Mar. 26, 2010) (denying summary judgment on this part of the inquiry); *Creighton v. City of Livingston*, 628 F. Supp. 2d 1199, 1212 (E.D. Cal. 2009) (finding issues of fact regarding the scope of employee's job duties precluded judgment on the pleadings under Rule 12(c)).  The Court is required to construes the facts and any reasonable inferences to be drawn from such facts most favorably to Plaintiffs and for purposes of resolving the motion to dismiss only, assumes that each Plaintiff's speech was made as a private citizen.

### c.      Substantial or Motivating Factor for Adverse Employment Action

An adverse employment action is not measured in degree, as a general rule, in order to be actionable.  *See, e.g.*, *Elrod v. Burns*, 427 U.S. 347, 359 n.13 (1976) (the government may not seek to achieve an unlawful end either directly or indirectly . . . rights are infringed both where

**MEMORANDUM DECISION AND ORDER - 20**

the government fines a person a penny and where it withholds the grant of a penny for the same

reason).   The denial of even a trivial benefit may form the basis for a First Amendment claim

where the aim of the government's conduct is to punish protected speech.  *Ulrich v. City & Cty.*

*of San Francisco*, 308 F.3d 968, 976 (9th Cir. 2002).  Depending on the circumstances, even

minor acts of retaliation can infringe on an employee's First Amendment rights.  *Coszalter v.*

*City of Salem*, 320 F.3d 968, 975-76 (9th Cir. 2003).  *See also Ellins v. City of Sierra Madre*, 710

F.3d 1049, 1061 (9th Cir. 2013) (holding that a deprivation of a five percent increase in salary

for a period of approximately three months was sufficient adverse action).

        Plaintiffs allege that after complaining that the Formula was non-compliant and

misallocated public funds, Haws retaliated by reducing the Commission's contribution to

Kenyon's salary from 35% to 10%, without explanation.  They contend that this resulted in

ICOG having to terminate Kenyon's employment.  After Scott sent letters of "talking points"

regarding the non-complaint Formula to senior citizen constituents, the Commission voted to

send a letter to the ICOG Board calling for Scott to be dismissed or sanctioned.  Haws then

issued a notice of dedesignation.

        Plaintiffs allege that these actions were taken by Haws and the Commissioners for their

protected speech in complaining about the non-compliant funding formula.  As set out above,

even if such actions were argued to be minor in nature, "minor" acts can infringe upon First

Amendment rights. Taken as true, Plaintiffs' allegations state a cognizable First Amendment

retaliation claim.

        d.      **Clearly Established Law**

        The next inquiry for the qualified immunity defense is whether the law proscribing

**MEMORANDUM DECISION AND ORDER - 21**

retaliation for the exercise of one's First Amendment freedoms was clearly established at the time of the alleged constitutional violations.  The answer is clearly yes.  In an analogous case, the Ninth Circuit has held that "state employees could not cause the termination of a two-year for profit government contract in retaliation for the contracting party's exercise of his First Amendment rights to speak out on a matter of public concern."  *Rivero v. City and County of San Francisco*, 316 F.3d 857, 864 (9th Cir. 2002).  In *Rivero*, a mortuary sued the city coroner and medical examiner alleging that they terminated the mortuary's contract to provide funeral and mortuary service's for the city's indigent dead because of statements the mortuary owner had made in the exercise of First Amendment rights.  *Id*.

The First Amendment right of public employees, and independent contractors, to be free from retaliation for commenting on matters of public concern outside their officials duties is well established.  *See Ellins v. City of Sierra Madre*, 710 F.3d 1049, 1065 (9th Cir. 2013).  In *Ellins*, the court recounted that it had been forty years since "the Supreme Court established that public employees have a First Amendment right to be free from retaliation for commenting on matters of public concern, even when the protected comments are critical of their employers."  *Id*. (citing *Pickering*, 391 U. S. at 571).  At this stage, taking the facts as alleged in the complaints as true, a fact-finder could find that Defendants violated Plaintiffs' clearly established constitutional rights by taking adverse action against them in retaliation for their constitutionally protected speech. The Court denies Defendants' motion to dismiss with respect to qualified immunity.

**C.     Have Plaintiffs Stated A Plausible Retaliation Claim?**

      **1.     Haws and Commissioner Defendants**

Defendants also move to dismiss Plaintiffs' claim on the grounds that they have failed to

**MEMORANDUM DECISION AND ORDER - 22**

state a claim upon which relief can be granted under Rule 12.  This discussion goes hand in hand

with the discussion above.  Under the standards set forth in *Twombly* and *Iqbal*, the Court finds

that Plaintiffs have stated a plausible claim for relief against Haws and the Commissioner

Defendants, as the Court set forth above in discussing *Pickering* and its first three factors.  A

complaint must contain sufficient factual allegations to provide plausible grounds for entitlement

to relief.  *Twombly*, 550 U.S. at 555–56.  "A claim has facial plausibility when the plaintiff pleads

factual content that allows the court to draw the reasonable inference that the defendant is liable

for the misconduct alleged." *Iqbal*, 565 U.S. at 678.  Plaintiffs have alleged that they complained

to various individuals about the purportedly non-compliant Formula well as the excessive

funding retained by the Commission, drafted a letter to the Governor, and mailed talking points

to senior citizen constituents.  After those events, Haws reduced the Commission's contribution

to Kenyon's salary from 35% to 10% and the Commissioner Defendants voted to send a letter to

ICOG demanding that Scott be dismissed or sanctioned for her participation in writing the letter

to the Governor.   Based on these allegations, Plaintiffs have alleged a plausible retaliation claim

at this time. Plaintiffs have alleged that they spoke out on a matter of public concern as private

citizens,[8] rather than public employees, and that their speech was a motivating factor in

---

[8] The issue of whether Plaintiffs were acting as public employees or private citizens as raised in the briefs and at the hearing piqued the Court's interest.  The Supreme Court emphasized in *Lane v. Franks* that the "mere fact that a citizen's speech concerns information acquired by virtue of his public employment does not transform that speech into employee - rather than citizen - speech."  134 S.Ct 2369, 2379 (2014).  Instead, the "critical question under *Garcetti* is whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties."  *Id*.  Whether an employee's disputed speech is part of her official duties presents a mixed question of fact and law.  *Posey v. Lake Pend Oreille Sch. Dist. No. 84*, 546 F.3d 1121, 1129 (9th Cir. 2008); *Clairmont v. Sound Mental Health*, 632 F.3d 1091, 1105 (9th Cir. 2011).  However, at this stage, the Court must accept Plaintiffs' allegations as true and in doing so, the Court does not changes its view that Plaintiffs

**MEMORANDUM DECISION AND ORDER - 23**

Defendants' adverse actions.  Plaintiff have sufficiently alleged a plausible retaliation claim against Haws and the Commissioner Defendants.

      **2.**        **Defendants Otter and Little**

While the Plaintiffs sufficiently allege that the Commissioner Defendants and Haws were involved with the alleged unconstitutional conduct, the Plaintiffs have not sufficiently alleged the personal involvement of Governor Otter and Lieutenant Governor Little in the constitutional violations.

"Section 1983 suits do not impose liability on supervising officers under a respondeat superior theory of liability." *Graves v. City of Coeur d'Alene*, 339 F.3d 828, 848 (9th Cir. 2003) "Instead, supervising officers can be held liable under section 1983 only if they play an affirmative part in the alleged deprivation of constitutional rights." *Id*. (internal citations and quotations omitted).   To be held liable, a supervising official must "set in motion a series of acts by others . . ., which he knew or reasonably should have known, would cause others to inflict the constitutional injury." *Id*. (internal citations and quotations omitted); *see also Larez v. City of Los Angeles*, 946 F.2d 630, 645 (9th Cir.1991). "Supervisory liability is imposed against a supervisory official in his individual capacity for (1) his own culpable action or inaction in the training, supervision, or control of his subordinates, (2) for his acquiescence in the constitutional deprivations of which the complaint is made, or (3) for conduct that showed a reckless or callous indifference to the rights of others." *Larez v. City of Los Angeles*, 946 F.2d 630, 646 (9th Cir.1991) (internal citations and quotations omitted).

Plaintiffs have not made a showing that, even with inferences drawn in their favor,

---

meet the Rule 8 standard for stating a plausible claim.

**MEMORANDUM DECISION AND ORDER - 24**

sufficiently alleges that Defendants Otter and Little personally participated in the alleged

deprivation of their constitutional rights, or knew of the alleged violations against Plaintiffs and

failed to prevent them.  Plaintiffs make no specific allegations of either Otter's or Little's

involvement in the alleged retaliatory acts.

The only personal involvement alleged as to either of them is that during a meeting on

January 20, 2014, "Defendant Little voiced his displeasure at Plaintiff's Public Records Request

of January 8, 2014, stating that state contractors were not to make Public Records Request to

their funding state agencies."   (Scott Compl., ¶ 47.)   The best that can be said of such an

allegation is that Plaintiffs contend that Lt. Governor Little was irked with them.  It is neither

alleged, nor a reasonable inference to conclude from such an allegation, that Lt. Governor Little

then set in motion or sat idly by as retaliatory actions were taken against the Plaintiffs.  The rest

of the allegations are vague and conclusory, such as: Defendant Otter and Defendant Little

"knowingly refused to terminate acts by Defendant Haws, which they knew, or reasonably

should have known, would cause her to inflict a constitutional injury to Plaintiff" and they

"acquiesced in the constitutional deprivation inflicted by Defendant Haws on Plaintiff."  Such

statements do not support a § 1983 claim.  *See Ivey v. Board of Regents of Univ. of Alaska*, 673

F.2d 266, 268 (9th Cir. 1982); *see also Iqbal*, 556 U.S. at 678 ("Nor does a complaint suffice if it

tenders naked assertions devoid of further factual enhancement.") The Courts finds that based on

the allegations in the complaints, Plaintiffs have failed to state a claim against Defendants Otter

and Little.

## D.     State Law Claims - Idaho Tort Claims Act Exceptions to Liability

In addition to the § 1983 claims, Scott also brings three state law claims, including: (1)

**MEMORANDUM DECISION AND ORDER - 25**

interference with contract against Defendant Haws; (2) intentional interference with prospective

economic advantage against Defendant Haws; and (3) reckless/negligent supervision against

Defendants Otter, Little, and the Commissioner Defendants.  (Scott Compl., pp. 17-18.)

Relevant here, the Idaho Tort Claims Act ("ITCA") establishes that governmental entities

are subject to liability for their own negligent or wrongful acts, and those of their employees who

were acting within the course or scope of their employment.  *See Hoffer v. City of Boise*, 257

P.3d 1226, 1228 (Idaho 2011) (citing *Grant v. City of Twin Falls*, 813 P.2d 880, 887 (Idaho

1991)); *see also* I.C. § 6-903(1) ("Except as otherwise provided in this act, every governmental

entity is subject to liability for money damages arising out of its negligent or otherwise wrongful

acts or omissions and those of its employees acting within the course and scope of their

employment or duties . . . where the governmental entity if a private person or entity would be

liable for money damages under the laws of the state of Idaho . . . .").  *However*, the ITCA goes

on to expressly exempt certain types of claims from that general rule.  *See Hoffer*, 257 P.3d at

1228 (citing *Grant*, 813 P.2d at 887-88).  The Defendants argue that certain of such exemptions

apply here.

### 1.    I.C. § 6-903(6)

This section states that the "nothing in this act shall enlarge or adversely affect the

liability of an employee or governmental entity.  Any immunity or other bar to a civil lawsuit

under Idaho or federal law shall remain in effect."  I.C. § 6-903(6).  This section merely provides

that immunities under federal law remain in effect and thus, the ITCA is not a waiver of

sovereign or other, such as judicial or prosecutorial, immunities. This provision does not impact

Scott's state law claims.

**MEMORANDUM DECISION AND ORDER - 26**

### 2.      I.C. 6-903(1)

This section states that, as long as exceptions do not apply, "every governmental entity is subject to liability for money damages arising out of its negligent or otherwise wrongful acts or omissions and those of its employees acting within the course and scope of their employment or duties . . . where the governmental entity if a private person or entity, would be liable for money damages . . ."   This section does not provide a specific immunity to Defendants.  Instead, it expresses the notion that if a private person, or entity, could be liable for the torts asserted by Scott, then so can a governmental entity, or its employee, *unless* other exceptions in the ITCA apply.

### 3.      I.C. § 6-904(3)

This section provides:

> A governmental entity and its employees while acting within the course and scope of their employment and without malice or criminal intent shall not be liable for any claim which . . . [a]rises out of assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contact rights.

I.C. § 6-904(3).  Idaho Code § 6-904(3) precludes liability against the governmental entities regardless of whether those entities' employees were acting with malice or criminal intent.  *See Hoffer*, 257 P.3d at 1228 ("The plain language of . . . [Idaho Code § 6-904(3)] exempts governmental entities from liability for the torts it lists, whether or not there has been an allegation of malice or criminal intent.").  Relying upon its previous holding in *White v. Univ. of Idaho*, 797 P.2d 108-09 (Idaho 1990), the Idaho Supreme Court in *Hoffer* went on to dissect Idaho Code § 6-1904(3)'s language, concluding in no uncertain terms:

**MEMORANDUM DECISION AND ORDER - 27**

> The requirement that an employee have acted "within the course and scope of their employment" plainly applies to the act of the employee and not of the governmental entity.  Therefore, the language "and without malice or criminal intent" that follows the statute's requirement that the employee have acted within the course and scope of employment, also by its plain language only applies to the employee.  Thus, "[a] governmental entity . . . shall not be liable for any claim which arises out of libel, slander . . . or interference with contract rights."

*Hoffer*, 257 P.3d at 1228-29 (internal citations omitted).

With respect to Defendant Haws, Scott has alleged Haws acted with malice.  (*See* Scott Compl., ¶ 82.)   An employee is only immune from suit for those intentional torts if there is no allegation of malice and/or criminal intent.  *Hoffer*, 257 P.3d at 1229.  Scott has alleged malice, therefore Haws is not immune, pursuant to I.C. § 6-904(3), for Scott's claims of intentional interference with a contract and intentional interference with a prospective economic advantage.[9] (*See* Scott Compl. ¶¶ 82, 84.)

### 4.   I.C. 6-904(1)

There are two prongs to this section of the ITCA.  The "discretionary" (sometimes called the "planning") prong provides immunity for "any act or omission . . . based upon the exercise or performance or failure to exercise or perform a discretionary function or duty on the part of a governmental entity or employee thereof, whether or not the discretion be abused."  I.C. § 6-904(1).  In determining whether a challenged action is in fact discretionary, the nature and quality of the challenged action must be examined.  For example, "[r]outine, every day matters not requiring evaluation of broad policy factors will more likely than not be 'operational.'  Decisions and actions which involve a consideration of the financial, political, economic and

---

[9]  For purposes of this motion and the applicability of I.C. § 6-904(3), the Court considers the torts of "intentional interference with a contract" and "intentional interference with a prospective economic advantage" in the same manner.

**MEMORANDUM DECISION AND ORDER - 28**

social effects of a given plan or policy will generally be 'planning' [discretionary] and fall within the discretionary function exception." *Bingham v. Franklin County*, 796 P.2d 527, 532 (Idaho 1990). The discretionary function exception does not apply to negligent operational decision-making, nor negligent implementation of a statute or policy. *See Czaplicki v. Gooding Joint Sch. Dist.*, 775 P.2d 640, 644 (Idaho 1989).

The other, "operational," prong provides immunity for "any act or omission . . . based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a governmental entity or employee thereof, whether or not the discretion is abused." I.C. § 6-904(1). The operational prong requires the exercise of ordinary or due care by the governmental entity or employee. *Id.* If governmental employees act with ordinary care and in accordance with policy decisions, they are afforded immunity. *Jones v. City of St. Maries*, 727 P.2d 1161, 1173 (Idaho 1986) (Huntley, J., concurring). Under Idaho law, whether a government employee exercised ordinary care is normally a factual question best left to the jury. *Czaplicki*, 775 P.2d at 645.

It is unclear from Defendants' briefing if they are asserting immunity under one prong or both prongs of this section. To the extent Defendants assert immunity under the first, "operational" prong of the section, that issue cannot be resolved on a motion to dismiss/judgment on the pleadings. The record is not developed enough for the Court to ascertain whether Defendants acted with negligence and at this stage, Scott has alleged, at the least, negligence which would bar immunity under this section, if her allegations are assumed to be true.

As to the discretionary prong, on this record, the Court cannot determine whether the

**MEMORANDUM DECISION AND ORDER - 29**

challenged actions were a "matter intertwined with the formulation of policy" such that they would be subject to immunity under the second prong of § I.C. 6-904(1).  *See Bingham*, 796 P.2d at 532.

     **5.**     **I.C. § 6-904B**

     This section precludes liability claims arising out of the "issuance, denial, suspension, or revocation of, or failure or refusal to issue, deny, suspend, or revoke a permit, license, certificate, approval, order or similar authorization" *if* there is no malice or criminal intent, as well as no "gross negligence or reckless, willful and wanton conduct."  Scott has alleged malice and recklessness in her complaint and taking her allegations as true at this stage, this section of the ITCA would not grant immunity upon Defendants.   (*See* Scott Compl., pp 17-18.)

**E.**     **Remaining Arguments**

     Defendants' remaining arguments include: (1) there was a superseding cause for Plaintiffs' harm, *i.e.*, it was ICOG who terminated Kenyon, and therefore Defendants cannot be liable to Kenyon; and (2) no other defendant is legally responsible for Haws's actions.  Decisions on these arguments posited by Defendants necessarily involve questions of fact that are inappropriate for resolving at this stage on this record.[10]

///

///

///

---

    [10]  Defendants also contend that Scott's state law claims should be dismissed based on lack of federal jurisdiction.  The Court has not dismissed Scott's federal claims, and supplemental jurisdiction over Scott's state law claims remains appropriately exercised.

**MEMORANDUM DECISION AND ORDER - 30**

## <u>ORDER</u>

IT IS HEREBY ORDERED that Defendants' Motions to Dismiss (Dkts. 9, 28) are GRANTED IN PART and DENIED IN PART.

DATED:  **September 28, 2016**

_____
Honorable Ronald E. Bush
Chief U. S. Magistrate Judge

**MEMORANDUM DECISION AND ORDER - 31**